[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 8, 2005
THOMAS K. KAHN
CLERK

_____

No. 04-14126

_____

D. C. Docket No. 04-01730-CV-JDW-TBM

ROCHELLE KENTOV,
Regional Director of the 12th Region
of the National Labor Relations Board,
for and on behalf of the National
Labor Relations Board,

                                                    Plaintiff-Appellee,

versus

SHEET METAL WORKERS' INTERNATIONAL
ASSOCIATION LOCAL 15, AFL-CIO,

                                                    Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(August 8, 2005)

Before TJOFLAT and KRAVITCH, Circuit Judges and LIMBAUGH*, District
Judge.

_____

* Honorable Stephen Limbaugh, United States District Judge for the Eastern District of
Missouri, sitting by designation.

KRAVITCH, Circuit Judge:

Sheet Metal Workers' International Association Local 15, AFL-CIO ("the Union"), appeals the district court's grant of a petition for a temporary injunction under Section 10(*l*) of the National Labor Relations Act ("NLRA"), filed by Rochelle Kentov, the Regional Director of the Twelfth Region of the National Labor Relations Board ("the Board").

## I. Background

The Union has a labor dispute with Massey Metals, Inc. ("Massey") and Workers Temporary Staffing ("WTS"), in connection with their use of non-union labor for an ongoing construction project at Brandon Regional Medical Center ("the hospital").[1] Massey is a sheet metal fabrication and installation contractor and WTS is a staffing agency that supplies labor employees to Massey.

On March 15, 2004, the key event giving rise to the instant case occurred. For about two hours, the Union staged a mock funeral procession in front of the hospital. Specifically, the procession entailed four representatives carrying a large object resembling a coffin back and forth on a sidewalk along Oakfield Drive, crossing South Moon Avenue which leads directly into the hospital's main

_____

[1] The hospital is a 277 bed acute care facility with approximately 1,500 employees.

entrance and intersects with Oakfield Drive.[2]  Oakfield Drive and South Moon

Avenue intersect about 100 feet from the hospital's main entrance.  The four

representatives were accompanied by another Union representative, who wore an

oversized grim reaper costume and carried a large sickle.  As the procession passed

in front of the hospital, the "grim reaper" marched along with the "pallbearers."

As part of the procession, the Union broadcasted somber funereal music

over loud speakers mounted on a flatbed trailer that was positioned nearby.  In

addition, four other Union representatives, some wearing t-shirts bearing the Union

logo, distributed handbills to persons entering and leaving the hospital.  The

handbills accurately detailed allegations from state court lawsuits concerning four

recent patient deaths at the hospital.[3]  They were entitled: "Going to Brandon

Regional Hospital Should Not be a Grave Decision."  Each handbill contained the

statement: "A public service message from the Sheet Metal Workers' International

Association."

The mock funeral procession was orderly.  Traffic was not blocked and

pedestrians were not obstructed.  The individuals handing out leaflets were orderly

and did not interfere or impede with the egress or ingress of any individuals to or

---

[2] The event was documented by a videotape which is part of the record.  The parties agree that the video fairly depicts what occurred.

[3] There is no allegation that the handbills were false or misleading.

from the hospital. No citations or arrests were made. Some passers-by walked up to the Union representatives to inquire about the purpose of the demonstration. One person who received a handbill talked to a Union representative about the allegedly improper care her husband was receiving as a patient in the hospital.

A hospital security officer reported that a wife of a patient at the hospital who had died that morning became upset at seeing the demonstration and would not walk out to her car because doing so required her to pass by the demonstration. Another individual who had a family member being treated inside the hospital complained to security officers about the demonstration because he did not think it was appropriate.

Following the event in question, on March 17, 2004, the hospital filed an unfair labor practice charge with the Board, alleging, *inter alia*, that the Union's conduct constituted an unlawful secondary boycott, in violation of Section 8(b)(4)(ii)(B) of the NLRA, 29 U.S.C. § 158(b)(4)(ii)(B), in that it coerced or restrained the neutral secondary employer hospital and its patients and visitors with an object of forcing or requiring the hospital to cease doing business with Massey and WTS, with whom the Union has a primary labor dispute.

On July 27, 2004, the Board's Regional Director filed a petition in the United States District Court for the Middle District of Florida, seeking an interim

injunction under Section 10(*l*) of the NLRA, 29 U.S.C. § 160(*l*), pending completion of the Board's administrative proceedings against the Union. The district court granted the petition, finding reasonable cause to believe that the Union had engaged in unfair labor practices in violation of Section 8(b)(4)(ii)(B) and that interim injunctive relief was just and proper.[4] The Union now appeals, raising two issues: (1) whether the district court erred in granting the interim injunction; and (2) even if an injunction is proper, whether this particular injunction is overbroad.

## II. Standard of Review

We review the district court's findings of fact for clear error and its conclusions of law for error. Arlook v. S. Lichtenberg & Co., Inc., 952F.2d 367, 372 (11th Cir. 1992). Finally, we review the district court's grant of the requested relief for abuse of discretion. Id.

## III. Discussion

Section 10(*l*) of the NLRA authorizes district courts to grant temporary injunctive relief pending the Board's resolution of certain unfair labor practice

---

[4] In pertinent part, the injunction "enjoined and restrained [the union] from threatening, coercing or restraining [the hospital] by staging street theater, processions, picketing, patrolling and/or any manner of conduct calculated to induce individuals not to patronize the hospital, when conducted with an objective of forcing or requiring [the hospital] to cease handling or otherwise dealing in the products or services of or to cease doing business with [Massey] and/or [WTS]." The injunction did not prohibit peaceful handbilling without picketing, patrolling, or procession.

5

charges, such as secondary boycotts, which are likely to have a disruptive effect upon the flow of commerce. 29 U.S.C. § 160(*l*); Dowd v. Int'l Longshoremen's Ass'n, 975 F.2d 779, 782-83 (11th Cir. 1992). A Section 10(*l*) proceeding is ancillary to the Board's administrative proceedings, and the ultimate determination of the merits of the unfair labor practice case is reserved for the Board, subject to review by the courts of appeals under Sections 10(e) and (f) of the NLRA. See Dowd, 975 F.2d 779.

In reviewing the grant of a Section 10(*l*) injunction, we consider only: (1) whether the Board has shown "reasonable cause to believe" that a union has violated the NLRA as alleged, and if so, (2) whether injunctive relief is "just" and "proper." See Id. at 783. In Dowd, this court explained:

> When confronted with a petition for injunction under section 10(*l*), the function of the District Court is not to determine whether an unfair labor practice has in fact been committed, but simply to determine whether there is reasonable cause to believe that a violation of the [National Labor Relations] Act has occurred. The district court's inquiry into reasonable cause is limited to evaluating whether the Board's theories of law and fact are not insubstantial and frivolous. This deferential review is appropriate at the injunction stage even where the theory underlying the petition is 'untested' or 'novel,' in order to preserve the legal issue for Board determination. In addition to demonstrating reasonable cause to believe that an unfair labor practice has occurred, the Board must show that equitable relief is 'just and proper' under the circumstances.

Id. (internal citations and quotation marks omitted).

6

Applying this deferential review here, we first examine whether there is reasonable cause to believe that the Union violated Section 8(b)(4)(ii)(B) of the NLRA, which prohibits secondary boycotts. Section 8(b)(4)(ii)(B) states that it is "an unfair labor practice for a labor organization...to threaten, coerce, or restrain any person engaged in commerce...where...an object thereof is...forcing or requiring any person to...cease doing business with any other person." 29 U.S.C. § 158(b)(4)(ii)(B). This provision aims to prohibit a union that has a labor dispute with one employer (the primary employer) from exerting pressure on another neutral employer (the secondary employer), where the union's conduct is calculated to force the secondary employer to cease doing business with the primary employer. See National Woodwork Mfrs. Ass'n v. NLRB, 386 U.S. 612, 620-27 (1967). As the Supreme Court has explained, Section 8(b)(4)(ii)(B) implements "the dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own." NLRB v. Denver Bldg. & Constr. Trades Council, 341 U.S. 675, 692 (1951).

A violation of Section 8(b)(4)(ii)(B) consists of two elements: (1) a union engages in conduct that threatens, coerces, or restrains an employer or other person

7

engaged in commerce; and (2) an object of the union's conduct is to force or require an employer or person not to handle the products of, or to do business with, another person. See 29 U.S.C. § 158(b)(4)(ii)(B). The satisfaction of the second element is not in dispute here, as the Union concedes that at least one of its objectives in staging the mock funeral procession was to pressure the hospital to cease doing business with WTS and Massey.[5] Therefore, our focus is on whether the Union threatened, coerced, or restrained the hospital within the meaning of the NLRA.[6]

The Union's principal defense is that the First Amendment protected its activities. To advance this argument, the Union relies on the Supreme Court's decision in Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568 (1988). There, a union peacefully distributed truthful handbills to customers near businesses in a shopping mall which urged customers not to shop at any of the stores until the mall owner publicly promised that all

_____

[5] Any other objectives that the Union may have had, such as publicizing allegations of improper patient care, do not control the secondary boycott analysis. See Denver Bldg. & Constr. Trades Council, 341 U.S. at 689; Pye v. Teamsters Local Union No. 122, 61 F.3d 1013, 1023 (1st Cir. 1995).

[6] Coercion under Section 8(b)(4)(ii)(B) involves "nonjudicial acts of a compelling or restraining nature, applied by way of concerted self-help consisting of a strike, picketing, or other economic retaliation and pressure in the background of a labor dispute." Carpenters Kentucky State Dist. Council (Wehr Constr., Inc.), 308 NLRB 1129, 1130 n.2 (1992) (quoting Sheet Metal Workers Local 48 v. Hardy Corp., 332 F.2d 682, 686 (5th Cir. 1964)).

construction work would be done using contractors who pay their employees fair wages.  DeBartolo, 485 U.S. at 570.  The union's primary labor dispute was with the construction company, but it sought to exert pressure on the mall owner through a consumer boycott to cease doing business with the non-union construction company.  Id. at 569.  The issue became whether the union's handbilling violated Section 8(b)(4)(ii)(B).  Id. at 573-74.

Recognizing the serious First Amendment problems involved in construing the NLRA to prohibit the union's handbilling, the Court applied the constitutional avoidance doctrine, reasoning that interpreting Section 8(b)(4)(ii)(B) to not reach the handbilling conformed with congressional intent.  Id. at 575-76.  The Court never answered the constitutional question of whether the First Amendment protected the union's handbilling, but simply held that the handbilling was not coercive within the meaning of Section 8(b)(4)(ii)(B).  Id. at 578, 588.

DeBartolo dealt only with a union's peaceful handbilling in the absence of any accompanying picketing or patrolling.  Therefore, the Union's reliance on that case is misplaced.  Indeed, in DeBartolo, the Court carefully distinguished peaceful expressive handbilling from picketing and patrolling, which it reasoned are "qualitatively different from other modes of communication" and more likely to be

9

found coercive under the NLRA.[7]  Id. at 580.  Citing to Justice Stevens's concurrence in NLRB v. Retail Store Employees, 447 U.S. 607 (1980) (Safeco), the Court explained:

> [Picketing is] a mixture of conduct and communication and the conduct element often provides the most persuasive deterrent to third persons about to enter a business establishment.  Handbills containing the same message...are much less effective than labor picketing because they depend entirely on the persuasive force of the idea.

Id. (internal quotation marks and citations omitted).  Thus, apart from peaceful, truthful handbilling, the Court recognized that many other forms of union secondary pressure do not raise First Amendment concerns.

In doing so, DeBartolo reaffirmed longstanding Supreme Court precedent that the Board can regulate union secondary picketing under Section 8(b)(4)(ii)(B) without implicating the First Amendment.  E.g., International Longshoremen's Ass'n v. Allied Int'l, Inc., 456 U.S. 212, 226 (1982) ("[w]e have consistently

---

[7] To further support its First Amendment argument, the Union cites to the Ninth Circuit's recent decision in Overstreet v. United Brotherhood of Carpenters & Joiners of America, Local Union No. 1506, – F.3d – , 2005 WL 1346720 (9th Cir. June 8, 2005).  As with its citation to DeBartolo, the Union's reliance on Overstreet is misplaced.  Overstreet involved a union's use of stationary banners, without any accompanying patrolling or picketing.  The Overstreet court repeatedly noted that the union did not engage in any picketing or patrolling and acknowledged that picketing and patrolling may be enjoined.  Overstreet, 2005 WL at *9-12 (noting that "[a]s in DeBartolo, the Carpenters' bannering does not involve patrolling..."); see also Benson v. United Brotherhood of Carpenters & Joiners of America, Locals 184 and 1498, 337 F. Supp.2d 1275, 1278-79 (also involving stationary union bannering and distinguishing it from union picketing and patrolling).

10

rejected the claim that secondary picketing by labor unions in violation of § 8(b)(4) is protected activity under the First Amendment."); Safeco, 447 U.S. 607, 616 (1980) (plurality opinion) ("As applied to picketing that predictably encourages consumers to boycott a secondary business, § 8(b)(4)(ii)(B) imposes no impermissible restrictions upon constitutionally protected speech"); Int'l Brotherhood of Electrical Workers, Local 501 v. NLRB, 341 U.S. 694, 705 (1951) (prohibition against secondary picketing "carries no unconstitutional abridgement of free speech"). These decisions are grounded in the recognition that the "labor laws reflect a careful balancing of interests" and under those laws "conduct designed not to communicate but coerce" merits less protection under the First Amendment. Allied Int'l, Inc., 456 U.S. at 226.

Here, the question is whether the Union's activity was equivalent to secondary picketing and patrolling which can be regulated under Section 8(b)(4)(ii)(B), or more like peaceful handbilling, which raises First Amendment concerns. We readily conclude that there is reasonable cause to believe that the Union's conduct falls in the former category as being the functional equivalent of picketing, and therefore, the First Amendment concerns in DeBartolo are not present in this case. Although the Union did not carry traditional picket signs, it is well-settled that the existence of placards on sticks is not a prerequisite to a finding

11

that a union engaged in picketing.  E.g., Mine Workers Dist. 2 (Jeddo Coal Co.), 334 NLRB 677, 686 (2001); Service Employees Local 87 (Trinity Building Co.), 312 NLRB 715, 743 (1993).  Instead, "[t]he important feature of picketing appears to be posting by a labor organization...of individuals at the approach to a place of business to accomplish a purpose which advances the cause of the union, such as keeping employees away from work or keeping customers away from the employer's business."  Lumber & Sawmill Workers Local Union No. 2797 (Stoltze Land & Lumber Co.), 156 NLRB 388, 394 (1965).

Here, the Union representatives patrolled for approximately two hours near the entrance of the hospital, carrying a large coffin and accompanied by a Union representative dressed as the grim reaper complete with a large sickle.  During the procession, the Union played somber funereal music from large speakers.  This activity could reasonably be expected to discourage persons from approaching the hospital, to the same degree, if not more, as would five union agents carrying picket signs.  Like traditional secondary picketing, the Union's procession was a "mixture of conduct and communication" intended to "provide the most persuasive deterrent to third persons about to enter" the hospital.  DeBartolo, 485 U.S. at 582. One of the Union's objectives in staging the procession was to exert pressure on the hospital to cease doing business with the non-union contractors, with whom the

12

Union had a primary labor dispute.  Under these facts, we hold that there is reasonable cause to believe that the Union violated Section  8(b)(4)(ii)(B) of the NLRA.[8]

In addition, interim injunctive relief was just and proper.   Notably, after the Board commenced the administrative action, the Union's counsel notified  the Board that, following a two week hiatus, the Union intended to engage in similar activities.  Furthermore, the Union had a track record of engaging in secondary pressure against the hospital.[9]  Injunctive relief was just and proper to prevent the

---

[8] Our holding is buttressed by the fact that the Administrative Law Judge ("ALJ") in the underlying unfair labor practice case recently issued a decision, Sheet Metal Workers' Int'l Local 15 (Brandon Regional Medical Center), Case 12-CC-1258 et al. (December 7, 2004), in which it found that the Union's activities on March 15, 2004 constituted a secondary boycott. See Rivera-Vega v. ConAgra, Inc., 70 F.3d 153, 161 (1st Cir. 1995) (district court's finding of reasonable cause was "confirmed by the fact that the administrative law judge, who held a hearing and took evidence of the NLRB's allegations" concluded that the violations occurred).

[9] In January 2003, the Union placed a 12-15 foot inflated rat balloon near the hospital's main entrance.  Concurrently, the Union distributed handbills that proclaimed "There's a 'Rat' at Brandon Regional Hospital."  The handbills depicted a rat in a patient's room and complained of WTS's allegedly unlawful conduct.  Due to this activity, in March 2003, the hospital filed an unfair labor practice charge against the Union, alleging that the Union had engaged in a unlawful secondary boycott, in violation of the NLRA.  In April 2003, the Board and the Union entered into a settlement agreement in which the Union agreed not to make false or misleading statements about the hospital, not to use a large inflated rat to discourage consumers from using the hospital, and not to in any other manner coerce the hospital with an object of forcing the hospital to stop doing business with WTS or other persons.  The Union's actions on March 15, 2004 that are at issue in this appeal resulted in a setting aside of the settlement agreement. Accordingly, the Regional Director issued an administrative complaint alleging that the Union's conduct on March 15, 2004 was unlawful, as well as the earlier conduct in January 2003.  On December 7, 2004, an administrative law judge ("ALJ") issued a decision in the underlying unfair labor practice case, finding that the Union had violated the NLRA on both occasions.  See supra, note 8.

potential adverse impact of secondary boycotts at the hospital and to preserve the status quo pending the Board's final action.

Finally, we address the Union's argument that the injunction is unconstitutionally overbroad. The Union maintains that even if its mock funeral procession did not implicate the First Amendment, the breadth of the interim injunction does. In particular, the Union contends that the injunction forbids any nonhandbilling activity and does not provide sufficient distance limitations. As a preliminary matter, the Board concedes that its 10(*l*) petition did not seek to enjoin all "street theater" and invites us to modify the injunction to remove that term. In light of this concession, we remand to the district court to modify the injunction by deleting the phrase "street theater." See Schaub v. West Michigan Plumbing & Heating, Inc., 250 F.3d 962, 971-72 (6th Cir. 2001) (modifying injunction which exceeded relief sought).

Even with this modification, the Union argues that the injunction goes too far. We disagree. After the modification, the injunction provides in pertinent part that the Union is:

> enjoined and restrained from threatening, coercing or restraining [the hospital] by staging processions, picketing, patrolling and/or any manner of conduct calculated to induce individuals not to patronize the hospital, when conducted with an objective of forcing or requiring [the hospital] to cease handling or otherwise dealing in the products or services of or to cease doing business with [Massey] and/or [WTS]...

14

Citing to DeBartolo, the injunction specifically excludes from its prohibition peaceful handbilling without picketing, patrolling, or procession. Contrary to the Union's contention, the injunction does not encompass all non-handbilling activity, but rather encompasses only coercive conduct that has a secondary objective at the approach to the neutral hospital. The Supreme Court has made it clear that coercion within the meaning of Section 8(b)(4)(ii)(B) is not protected by the First Amendment. See, e.g., DeBartolo, 485 U.S. at 579-80. Indeed, the wording of the injunction is comparable to that of Section 8(b)(4)(ii)(B) orders that courts routinely enforce. E.g., Pye v. Teamsters Local Union No. 122, 61 F.3d 1013, 1018 n.4 (1st Cir. 1995); Dowd v. Int'l Longshoremen's Ass'n, 781 F. Supp. 1565, 1575 (M.D. Fla. 1991), aff'd, 975 F.2d 779 (11th Cir. 1992). Furthermore, the injunction is in accordance with longstanding remedies in this context that do not contain distance limitations. See Safeco, 447 U.S. at 619 (Stevens, J., concurring); Jeddo Coal Co., 334 NLRB at 689; Trinity Building Co., 312 NLRB at 756, enf'd, 103 F.3d 139 (9th Cir. 1996). Under these circumstances, the interim injunction, as modified, is appropriate.

For the foregoing reasons, we AFFIRM the judgment of the district court but REMAND for modification of the injunction to delete the phrase "street theater."

**AFFIRMED and REMANDED.**

15