# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 5, 2007         Decided June 19, 2007

No. 06-1028

SHEET METAL WORKERS' INTERNATIONAL ASSOCIATION,
LOCAL 15, AFL-CIO,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

ENERGY AIR, INC. AND
GALENCARE, INC., *D/B/A* BRANDON REGIONAL MEDICAL
CENTER,
INTERVENORS

———

Consolidated with
06-1072

———

On Petition for Review and
Cross-Application for Enforcement
of an Order of the National Labor Relations Board

———

*Michael T. Anderson* argued the cause for petitioner. With
him on the briefs was *Arlus J. Stephens*.

*Jamin B. Raskin* was on the brief for *amicus curiae*

Greenpeace USA in support of petitioner.

*Kira Dellinger Vol*, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were *Ronald E. Meisburg*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Aileen A. Armstrong*, Deputy Associate General Counsel, and *Julie B. Broido*, Senior Attorney.

*Tammie L. Rattray* and *Patrick Muldowney* were on the brief for intervenors Energy Air, Inc. and Galencare, Inc., *d/b/a* Brandon Regional Medical Center. *David A. Grant* entered an appearance.

*Maurice Baskin* was on the brief for *amicus curiae* Associated Builders and Contractors, Inc. in support of respondent.

Before: GINSBURG, *Chief Judge*, and GRIFFITH, *Circuit Judge*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Chief Judge* GINSBURG.

GINSBURG, *Chief Judge*: In the course of a labor dispute with Energy Air, a heating, ventilation, and air conditioning contractor, Sheet Metal Workers' Local 15, AFL-CIO notified Beall's, Inc. — a department store for which Energy Air was performing mechanical work — that the Union "will be compelled" to publicize its dispute with Energy Air at two of Beall's department store construction sites. The Union's letter to Beall's did not contain the assurance required by the National Labor Relations Board that the Union's picketing would conform to the Board's standards for picketing a neutral employer, as laid out in *Moore Dry Dock* and its sequelae.

The Union also staged a "mock funeral" at the Brandon Regional Medical Center (the Hospital), which was using non-union workers supplied by a temporary employment agency and another mechanical contractor, with both of which the Union had an unrelated dispute. Energy Air and the Hospital each filed charges with the Board, which concluded the Union in each instance had violated the National Labor Relations Act.

The Board issued a Decision and Order barring the Union from picketing the Hospital and from "unqualifiedly threatening" to picket Beall's. The Union petitions for review, which we grant, and the Board cross-applies for enforcement of the Order, which we deny.

## I. Background

A. The Threat to Picket Beall's

In September 2003 a Union representative wrote the president of Beall's a letter stating:

> Our organization has an ongoing labor dispute with Energy Air, Inc. This contractor has been charged with serious **Federal Law Violations** and is currently being investigated by the Federal Government.

> We understand that Energy Air is performing HVAC mechanical work on [two] Beall's Department Store construction projects ....

> The union will be compelled to publicize our dispute with Energy Air by the way of leafleting, protesting and the possibility of picketing at the sites.

> If you have any questions I can be contacted at ....

Based upon this letter alone, an Administrative Law Judge (ALJ) concluded the Union had violated Section 8(b)(4)(ii)(B) of the National Labor Relations Act (the Act), 29 U.S.C. § 158(b)(4)(ii)(B), which makes it an unfair labor practice for a union to "threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce [viz., Beall's] where ... an object thereof is ... forcing or requiring any person [viz., Beall's] ... to cease doing business with any other person [viz., Energy Air]." *Id.*

Under the longstanding rule of *Sailors' Union of the Pacific (Moore Dry Dock)*, 92 NLRB 547 (1950), the proprietor of a so-called common situs — a job site at which the employees of multiple employers are working — may create a "reserved gate" or entrance for use solely by the employees of any employer that is then the target of union picketing; if a reserved gate is set up, the union may picket only there. *Id.* at 549-50. In this case the ALJ concluded the Union's threat to picket Beall's violated § 8(b)(4)(ii)(B) because it was not "qualified" by an assurance the Union would limit its picketing to a reserved gate, as required under *Moore Dry Dock*, citing *Teamsters Local 456 (Peckham Materials)*, 307 NLRB 612, 619 (1992) (where union threatens neutral contractor with picketing of job site at which primary employer is working, union has "affirmative obligation to qualify its threat by clearly indicating that the picketing would conform to *Moore Dry Dock* ... or otherwise be in uniformity [sic] with Board law").

Although the Ninth Circuit has expressly rejected the proposition that a union must affirmatively declare its intention to conform with *Moore Dry Dock*, *see United Ass'n of Journeymen, Local 32 v. NLRB (Local 32)*, 912 F.2d 1108, 1110 (9th Cir. 1990), the ALJ noted "the Board continues to require a union to indicate that its picketing will conform to *Moore Dry Dock*" and cited a recent Board decision to that effect, *Electrical*

*Workers, Local 98 (MCF Services)*, 342 NLRB 740 (2004). The ALJ accordingly held the Union had violated § 8(b)(4)(ii)(B) by uttering a proscribed threat but dismissed the complaint insofar as it pertained to leafleting and protests at the Beall's job site because such activities were not coercive and therefore did not violate the Act. In its Decision and Order the Board affirmed these decisions of the ALJ.

B. The Curious Case of the Rat and the Placard at the Hospital

In January and February of 2003 the Union distributed leaflets outside the Hospital protesting the presence of non-union workers employed either by Workers Temporary Staffing, Inc. (WTS) or by Massey Metals, Inc., which was using workers supplied by WTS. The handbills stated, "There's a 'Rat' at Brandon Regional Hospital" and showed a cartoon of a rat near the bed of a sick patient. The Union also inflated a balloon, some 16-feet tall and 12-feet wide, in the shape of the cartoon rat, about 100 feet from the main entrance to the hospital. The ALJ concluded the leafleting, one union member's holding the leaflet chest-high as a "placard," and the inflation of the rat each violated § 8(b)(4)(ii)(B).

The Board reversed the ALJ as to the leafleting because the General Counsel had disavowed that finding. The Board "found it unnecessary to pass on" whether the inflation of the rat or using the leaflet as a placard violated § 8(b)(4)(ii)(B) the Act because, in view of the unfair labor practices found in connection with the mock funeral described below, "[a] finding of such a violation as to these matters would be cumulative and would not affect the order."

C. The Mock Funeral at the Hospital

On March 15, 2004 the Union staged a "mock funeral"

outside the Hospital and distributed leaflets headed "Going to Brandon Hospital Should Not Be a Grave Decision"; the leaflets detailed several malpractice suits against the Hospital — the implication being the alleged malpractice was linked to the Hospital's use of non-union labor. The "mock funeral" comprised one person in a "Grim Reaper" costume carrying a "plastic sickle" and four other people, dressed in street clothes, carrying a prop coffin and occasionally handing out leaflets.

These *dramatis personae* walked back and forth over a distance of about 400 feet on a sidewalk parallel to the front of the Hospital but apparently, from the Union's videotape of the event, some 100 feet from the entrance and separated from it by a street, a strip of grass, a short hedge, and a parking lot, crossing at a cross-walk every three to five minutes a street running perpendicular to the Hospital. They were accompanied by various somber tunes emanating from a portable audio system, including Siegfried's Funeral March by Wagner, O Fortuna from Carl Orff's Carmina Burana, and the third movement from Chopin's Piano Sonata No. 2. The mock funeral lasted about two hours but, according to the testimony of one of the participants, because the Union members frequently "took breaks," this bit of "street theater" was ongoing for only "45 minutes to an hour ...[,] about half the time."

In July 2004, while the unfair labor practice complaint arising out of the mock funeral was pending before the ALJ, the Regional Director of the NLRB asked the U.S. District Court for the Middle District of Florida to enjoin the Union, pursuant to Section 10(*l*) of the Act, from restaging the mock theater or otherwise picketing or patrolling at the Hospital on the ground those activities would violate § 8(b)(4)(ii)(B). *See* 29 U.S.C. § 160(*l*). The district court, after reviewing a Union-made videotape of the event, found the mock funeral had been "orderly" and that "[n]o traffic was blocked, pedestrians were

not obstructed or challenged and there appeared to be no eye contact or verbal contact [between] any participant" [and any Hospital patron]. Likewise, "[t]he leafleters [at the mock funeral] were orderly, non-confrontational and did not interfere [with] or impede ... the egress or ingress of any individuals to or from the hospital." Nonetheless, the district court enjoined the Union from "threatening, coercing or restraining [the Hospital] by staging street theater ... [or] processions" or by "picketing, patrolling and/or any manner of conduct calculated to induce individuals not to patronize the hospital."

While review of the injunction was pending before the Eleventh Circuit,[*] the ALJ concluded the Union had violated Section 8(b)(4)(ii)(B) because the mock funeral constituted "picketing" and people "were forced to view and cross a death march in order to patronize the Hospital." In its Decision and Order the Board agreed with the ALJ that the mock funeral in this case was unlawful picketing, though the members of the panel aired somewhat different views on the general subject.[**]

---

[*] The Eleventh Circuit, giving "deferential review" to the position of the Board, held the mock funeral was the "functional equivalent of picketing," *Kentov v. Sheet Metal Workers' Int'l Ass'n Local 15*, 418 F.3d 1259, 1265 (11th Cir. 2005), and affirmed the injunction except as to the prohibition of "street theater," *id.* at 1267, because the Board conceded its request for an injunction was not a request to enjoin all "street theater" but only repetition of the mock funeral, *id.* at 1266.

[**] Member Liebman contended that "ambulatory picketing or patrolling classically involves more than the 'mere persuasion' of a banner, it also involves the intimidation of a physical or symbolic barrier to the entrance way," so that in this case it was "the patrolling," not the use of a plastic sickle or the message conveyed by the mock funeral, that erected a barrier to the Hospital. For support she pointed to the Supreme Court's "embrace" in *Edward J. DeBartolo Corp. v.*

The Board therefore ordered the Union to cease and desist from "[p]icketing [the Hospital] with the object of forcing it to cease doing business with Massey Metals ... and Workers Temporary Staffing."

## II. Analysis

The Union argues its letter to Beall's did not violate Section 8(b)(4)(ii)(B) of the Act, first, because the Union has no obligation to assure a neutral employer that its picketing will be limited to a reserved gate as required by law and, at any rate, because Beall's did not establish a reserved gate. With respect to the Hospital, the Union argues the mock funeral was protected by the First Amendment to the Constitution of the United States and points out that even offensive expressions are protected by Section 8(c) of the Act itself.[*]

---

*Florida Gulf Coast Building & Construction Trades Council*, 485 U.S. 568, 580 (1988), of Justice Stevens's concurrence in *NLRB v. Retail Store Employees Union, Local 1001 (Safeco)*, 447 U.S. 607 (1980), in which the Justice characterized picketing as "a mixture of conduct and communication. In the labor context," he continued, "it is the conduct element rather than the particular idea being expressed that often provides the most persuasive deterrent to third persons about to enter a business establishment." *Id.* at 619.

Chairman Battista and Member Schaumber agreed with Member Liebman "as to the reasons why [sic] this conduct was picketing," but noted "to the extent [Member Liebman] implies that picketing requires a physical or symbolic barrier, we do not necessarily agree. ... It may be that other conduct, short of a barrier, can be 'conduct' that is picketing or at least 'restraint or coercion' within the meaning of Section 8(b)(4)(ii)(B)."

[*] Section 8(c) provides express statutory protection for speech that is not threatening or coercive. *See* 29 U.S.C. § 158(c)

We review an order of the Board deferentially insofar as we must determine whether the Board "acted arbitrarily or otherwise erred in applying established law to the facts of the case." *Stanford Hosp. & Clinics v. NLRB*, 370 F.3d 1210, 1212 (D.C. Cir. 2004). The Board receives no deference, however, insofar as we review an order for consistency with the Constitution. *See DeBartolo*, 485 U.S. at 574-76; *Univ. of Great Falls v. NLRB*, 278 F.3d 1335, 1340-41 (D.C. Cir. 2002); *cf. Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 567 (1995) (reviewing claim to protection of the First Amendment by "independent examination of the record as a whole, without deference to the trial court").

A. The Threat to Beall's

The Union argues that because Beall's neither established a reserved gate nor notified the Union that it intended to do so, "the Union ha[d] no duty to assume that such a system would be in place, and no duty to propose a reserved gate system on its own." Moreover, the Union cannot have broken the law, it maintains, by failing to promise it would not break the law. The Board responds that its rule requiring a union to indicate it will abide by *Moore Dry Dock* is consistent with its own precedents, that is, "Board law," *see, e.g.*, *State Elec.*, 342 NLRB No. 74 (2004).

---

("expressing of any views, argument, or opinion ... shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force ..."). We do not analyze the Union's argument separately under the statute and the Constitution because the Supreme Court has explained that Section 8(c) "merely implements the First Amendment," *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617 (1969), and the relevant case law arises under the Constitution, not under the statute.

The Union relies upon three propositions, all of which we find persuasive: (1) the Ninth Circuit in *Local 32* has squarely rejected the Board's rule in a reasoned opinion; (2) though we have not ruled upon the issue, this circuit's precedents are consistent with the reasoning of the Ninth Circuit; and (3) the Board's rule violates what the Union calls "the canon of federal labor law that if a course of action is lawful, advance notice of it is also lawful," for which it refers us to *NLRB v. Servette, Inc.*, 377 U.S. 46, 57 (1964), where the Court stated that protection of lawful conduct "would be undermined if a threat to engage in protected conduct were not itself protected."

The Board's failure even to mention *Local 32* in its brief is of a piece with its apparent refusal generally to recognize the existence of that case, in which the Ninth Circuit held the Board "could not presume that a union's threat to picket the job was a threat to picket contrary to the law, when picketing at the job could be done in a lawful manner," and said "such a presumption is without foundation in the Act, relevant case law or any general legal principles." 912 F.2d at 1110. The ALJ acknowledged *Local 32*, but noted that the Board "accepted [it] only as the law of the case" and "continues to require a union to indicate that its picketing will conform to *Moore Dry Dock* standards." In short, the Board continued to adhere to its preferred rule, *see generally* Samuel Estreicher & Richard L. Revesz, *Nonacquiescence by Federal Administrative Agencies*, 98 Yale L.J. 679 (1989), and in its decision did not deign to acknowledge the contrary holding of the Ninth Circuit.

The Ninth Circuit's decision is not binding upon this court, of course, but it is considerably more persuasive than the Board's conclusory claim that its rule is a "reasonable interpretation" of § 8(b)(4)(ii)(B). The Board offers us no reason to believe it can make an unfair labor practice out of a union's failure to assure an employer the union will abide by the

law.

In addition to *Local 32* the Union points to this court's decision in *J.F. Hoff Electric Co. v. NLRB*, 642 F.2d 1266 (1980). There we explained that under *Moore Dry Dock* "neutral employers may insulate themselves from ... picketing only if the reserved gate practice is faithfully observed." *Id.* at 1271. This proposition, the Union reasons, necessarily implies that "[w]here a site owner like Beall's fails to set up a reserved gate *at all* ... the Union cannot be held liable for threatening primary picketing at the site." This is also consistent, the Union argues, with our decision suggesting it is an employer's role to inform a union of, and not the union's obligation to ferret out, business information relevant to the lawfulness of any self-help in which the union might engage, *see, e.g.*, *United Scenic Artists, Local 829 v. NLRB*, 762 F.2d 1027, 1031 (1985) (burden on employer to inform union about its business plans regarding use of non-union labor or control of materials); by parity of reasoning, the burden of informing a union about the existence of or plan to erect a reserved gate should be on the neutral employer.

The Board's response is that *J.F. Hoff* merely affirmed that the Union must target the primary employer "as exclusively as possible," and that unlike the business information at issue in *United Scenic Artists* and *J.F. Hoff* itself, "the existence or lack of a reserved gate ... is apparent to the casual observer." True enough if the observer, including a would-be picket, shows up at a common situs with a proper reserved gate in place. *See, e.g.*, *Local Union No. 501, Int'l Bhd. of Elec. Workers v. NLRB*, 756 F.2d 888, 890 n.1 (D.C. Cir. 1985) (detailing signs that adequately identify a reserved gate). The Board does not, however, explain why this distinction between what is and what is not apparent at the job site should turn a letter about picketing a site that lacks a reserved gate into a threat to picket that site in

a manner that would violate the rules of engagement applicable if it did have a reserved gate.

We therefore adopt the Ninth Circuit's straightforward reasoning that the Board "could not presume that a union's threat to picket the job was a threat to picket contrary to the law, when picketing at the job could be done in a lawful manner"; we agree that "such a presumption is without foundation in the Act, relevant case law or any general legal principles," *Local 32*, 912 F.2d at 1110. Because the Union's letter to Beall's made no suggestion it intended to do anything that would violate the Act and the Board may not presume the letter was a "threat to picket contrary to the law, when picketing ... could be done in a lawful manner," *id.*, we vacate the Board's Decision and Order to the extent it holds the Union's letter violated the Act and orders the Union to cease "unqualifiedly threatening to picket."

B. The Mock Funeral at the Hospital

The Union argues the mock funeral "could never have been prohibited if it had expressed opposition to the Hospital's practices, environmental policy, or any other grievance." More specifically, under the Supreme Court's abortion protest cases the Union's activities were constitutionally protected and cannot be considered coercive or intimidating; different rules for labor protests would be unconstitutional viewpoint discrimination. The Union points out that *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753 (1994), and *Hill v. Colorado*, 530 U.S. 703 (2000), provide specific guidance as to what kinds of protest activities government may and may not proscribe. In *Madsen*, the Supreme Court held that a state-court injunction creating a 300-foot buffer zone around an abortion clinic, within which protesters were prohibited from "physically approaching any person seeking services" at the clinic, was an unconstitutional burden upon the protesters' right of free speech, 512 U.S. at 773;

*id.* at 776; at the same time the Court upheld the injunction's 36-foot buffer zone around the clinic's entrances and driveways, *id.* at 770. In *Hill*, the Court upheld as constitutional a state statute making it unlawful, within 100 feet of the entrance to an abortion clinic, to make an unwanted physical approach to within eight feet of another person for the purpose of passing out a leaflet, handbilling, displaying signs, or engaging in oral protest, education, or counseling, 530 U.S. at 707 n.1, 714.

In this case, as the record and particularly the videotape therein reveal, the Union's conduct was fully consistent with *Madsen* and *Hill*. The Board would have us distinguish those cases on the ground that here there is a strong governmental interest in regulating picketing the objective of which — "to pressure the Hospital, a neutral entity, to stop doing business with certain non-union contractors" — is proscribed by statute; so it is that the Eleventh Circuit, in the related injunction proceeding, "rejected the Union's constitutional defense." *See Kentov*, 418 F.3d at 1264-65. But in that case, which arose under Section 10(*l*) of the Act, the court of appeals' review was "limited to evaluating whether the Board's theories of law and fact are not insubstantial and frivolous," *Dowd v. Int'l Longshoremen's Ass'n*, 975 F.2d 779, 783 (11th Cir. 1992) (internal quotation marks omitted). *See Kentov*, 418 F.3d at 1263. The court did not fully address the merits of the Union's constitutional argument because it was enough, in that procedural context, for the court to conclude "there [was] reasonable cause to believe that the Union's conduct ... [was] the functional equivalent of picketing, and therefore, the First Amendment concerns in *DeBartolo* [were] not present," *id.* at 1265.

Before this court the Board generally ignores the Union's "content-based" argument but does point us to the Supreme Court's observation in *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), that "[s]econdary boycotts and picketing by

labor unions may be prohibited, as part of Congress' striking of the delicate balance between union freedom of expression and the ability of neutral employers, employees, and consumers to remain free from coerced participation in industrial strife," *id.* at 912 (internal quotation marks omitted). That statement, however, leaves open the question what constitutes "coerced participation" in a labor dispute and, of course, does nothing to suggest coercion may be defined so broadly as to crimp the free speech guarantee of the First Amendment. Moreover, as the Union points out, the Court has since rejected the claim that labor picketing is necessarily "commercial speech ... and thereby entitled to a lesser degree of constitutional protection." *DeBartolo*, 485 U.S. at 576. The Court also has confirmed that the canon of constitutional avoidance is not suspended merely because a secondary boycott is at issue. *See id.* at 575 ("where an otherwise acceptable construction of [the Act] would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress"). We therefore review the Board's application of the Act to the facts of this case mindful that the National Labor Relations Act "ought not be construed to violate the Constitution if any other possible construction remains available," *NLRB v. Catholic Bishop of Chi.*, 440 U.S. 490, 500 (1979).

The Supreme Court's opinion in *DeBartolo* also makes clear that, in contrast to Section 8(b)(4)(i)(B), under which it is illegal per se to "induce or encourage" employees of a secondary employer to strike, not every effort to convince consumers to boycott a secondary employer is illegal under Section 8(b)(4)(ii)(B): "[M]ore than mere persuasion is necessary to prove a violation of § 8(b)(4)(ii)(B): that section requires a showing of threats, coercion, or restraints." 485 U.S. at 578. Before *DeBartolo*, the Court had "left no doubt that Congress may prohibit secondary picketing" directed to "'the customers

of the secondary employer,'" *Safeco*, 447 U.S. at 616 (quoting *NLRB v. Fruit and Vegetable Packers, Local 760 (Tree Fruits)*, 377 U.S. 58, 63 (1964)), but the Court had not spoken to the question whether the Congress had — or for that matter, whether it could have — prohibited other means of appealing to the customers of the secondary employer, such as the handbilling and the mock funeral in this case, the latter of which is neither picketing nor handbilling but has elements of each.

After *DeBartolo*, it is clear that unlike picketing or patrolling, handbilling directed at secondary consumers is ordinarily not coercive and therefore does not run afoul of § 8(b)(4)(ii)(B). *See* 485 U.S. at 578. At the very least, therefore, the Union is correct that after *DeBartolo* its "objective" in conducting the mock funeral — to persuade consumers not to patronize the Hospital, the secondary employer, so the Hospital would not deal with Energy Air, the primary employer — was not proscribed by § 8(b)(4)(ii)(B).

As for the means the Union used to appeal to customers of the secondary employer, the mock funeral was a combination of street theater and handbilling. The Eleventh Circuit and the Board deemed this the "functional equivalent of picketing," *Kentov*, 418 F.3d at 1265, but did not distinguish ends from means. Clearly, the Union's end in conducting the mock funeral was to dissuade consumers from patronizing the secondary employer, and in that sense the funeral was the functional equivalent of picketing. Just as clearly, however, the mock funeral was not the functional equivalent of picketing as a means of persuasion because it had none of the coercive character of picketing, as the Eleventh Circuit itself found: Union members did not physically or verbally interfere with or confront Hospital patrons coming and going; nor, contrary to Member Liebman's description, did the mock funeral participants "patrol" the area in the sense of creating a symbolic barrier to those who would

enter the Hospital.[*] Had they done so, or in any other way interfered with or confronted patrons entering or leaving the Hospital, we would agree with the Board that the Union's conduct was the "functional equivalent of picketing," and therefore coercive and unlawful. *See, e.g.*, *Overstreet v. United Bhd. of Carpenters, Local No. 1506*, 409 F.3d 1199, 1213, 1213-15 (9th Cir. 2005) (concluding, in preliminary injunction case, banner protest was not picketing where it did not include ambulatory picketing, signal picketing, or interference with or likelihood of confrontation with customers entering or exiting business); *Prod. Workers Union of Chi. & Vicinity v. NLRB*, 793 F.2d 323, 328 n.4 (D.C. Cir. 1986) ("picketing is ordinarily an attempt, by means of patrolling at a site with a message of some kind on the picket sign, to instigate a boycott" (quoting Howard Lesnick, *The Gravamen of the Secondary Boycott*, 62 Colum. L. Rev. 1363, 1364 n.5 (1962)) (internal quotation marks omitted)). Nor was there, in this case, any "signal picketing," which entails "an implicit instruction to other union members, including union employees of secondary businesses," to stop work. *Overstreet*, 409 F.3d at 1215. The mock funeral and handbilling were addressed solely to customers; the Board does not suggest the Union in any way signaled union employees of the Hospital. We therefore conclude the mock funeral was not the functional equivalent of picketing.

Having determined the mock funeral lies somewhere between the lawful handbilling in *DeBartolo* and unlawful picketing or patrolling, we reach the ultimate question whether

---

[*] Member Liebman described the funeral as a "procession in which four persons went back and forth on the public sidewalk in front of the hospital's main entrance," thereby creating a "symbolic barrier, a line ... not to be crossed," which conveys the erroneous impression that the funeral was immediately adjacent to, rather than 100 feet away from, the entrance.

the means by which the Union delivered its message was coercive, threatening, restraining, or "intimidating." *See DeBartolo*, 485 U.S. at 580 ("loss of customers because they read a handbill urging them not to patronize a business, and not because they are intimidated by a line of picketers, is the result of mere persuasion, and the neutral who reacts is doing no more than what its customers honestly want it to do"). That question must be answered consistent with developments in the Supreme Court's first amendment jurisprudence.

No court has yet determined how the Supreme Court cases dealing with protests at abortion clinics apply to the question whether a particular labor protest is coercive. Hence, we revisit the abortion protest cases themselves for such light as they shed upon the kinds of union conduct to be deemed intimidation and therefore unprotected by the First Amendment. Recall the Board described the mock funeral as "patrolling," and *DeBartolo* suggests patrolling is per se coercive and therefore a violation of the Act. As stated earlier, we disagree with the Board that the conduct was "picketing," and so the question for us is whether the activity was coercive. The abortion cases tell us that "coercion" must be understood in a manner consistent with the First Amendment.

Here the Union's protest was consistent with the limitations upheld as constitutional — the buffer zones and the ban on confrontational conduct — in *Madsen* and *Hill*. The mock funeral occurred about 100 feet from the Hospital and the Board does not claim the participants approached patrons any closer to the Hospital. Indeed, the Union's protest operated well within those limitations, for the videotape shows the mock funeral was a quiet affair, not at all like the charged atmosphere surrounding the abortion protests in *Madsen*, *see* 512 U.S. at 758 ("The number of people congregating [at abortion protests] varied from a handful to 400, and the noise varied from singing and

chanting to the use of loudspeakers and bullhorns"); the Union protesters came nowhere near blocking anyone's ingress or egress and did not even make eye contact with Hospital patrons. Their behavior was orderly, disciplined, even somber, as befits a funeral; nothing they did can realistically be deemed coercive, threatening, restraining, or intimidating as those terms are ordinarily understood — quite apart, that is, from any special understanding necessary to avoid infringing upon the Union members' right of free speech.

Nor was their "message" — invoking the iconography of the funeral rite and stating that "Going to Brandon Hospital Should Not Be a Grave Decision" — one by which a person of ordinary fortitude would be intimidated. The Board would have us believe, in the words of the ALJ, the mock funeral "forced" patrons to "cross a death march" in order to get to the Hospital, as if the horrors of Bataan in 1942 were being reenacted in front of the Hospital. The procession was not only orderly, the protesters went out of their way to convey a law-abiding, and therefore nonthreatening, attitude; as the district court in *Kentov* observed, "The participants politely pressed a 'walk' button and waited for a 'walk' signal at the crosswalk before crossing." Their message may have been unsettling or even offensive to someone visiting a dying relative, *see Kentov*, 418 F.3d at 1262, but unsettling and even offensive speech is not without the protection of the First Amendment. *See, e.g.*, *Hill*, 530 U.S. at 716 ("[t]he right to free speech ... may not be curtailed simply because the speaker's message may be offensive to his audience"); *see also McQueary v. Stumbo*, 453 F. Supp. 2d 975, 987 (E.D. Ky. 2006) (noting, in granting preliminary injunction against enforcement of state statute aimed at preventing antihomosexual picketing at funerals, "individuals have a First Amendment right to speak ... about a public issue — even where the speech is distasteful, discomforting, odious or ignorant").

In sum, the Union is correct that, pursuant to *DeBartolo*, its attempt to persuade consumers to boycott the Hospital must be evaluated in a manner consistent with the First Amendment. Under the Court's decisions in *Hill* and *Madsen*, sources of constitutional guidance with which the Union quite obviously complied, the mock funeral was not "threaten[ing], coerc[ive], or restrain[ing]," in violation of Section 8(b)(4)(ii)(B). It follows that the Board erred in holding the Union violated that section of the Act by "picketing" the Hospital.

C. Failure to Provide Notice under Section 8(g)

The Board also held the Union violated Section 8(g) of the Act because it did not provide written notice to the Hospital at least 10 days before it conducted the protests there. *See* 29 U.S.C. § 158(g) (labor organization must give notice at least 10 days before "engaging in any strike, picketing, or other concerted refusal to work at any health care institution"). The Union objects that its protest was not a "strike, picket[], or other concerted refusal to work," and because it did not appeal to the Hospital's employees neither was it an inducement to strike, etc. That is plainly correct. We therefore hold the Union did not violate Section 8(g) of the Act.

### III. Conclusion

For the forgoing reasons, we grant the Union's petition for review of the Board's Decision and Order and deny the Board's cross-application for enforcement. The case is remanded for the Board to consider the issues it did not reach in the Decision and Order because they would have been cumulative and would not have affected the Order had it survived review.

*So ordered.*