In the

# United States Court of Appeals
## For the Seventh Circuit

No. 13-1938

520 SOUTH MICHIGAN AVENUE ASSOCIATES,
LIMITED, d/b/a The Congress Plaza Hotel &
Convention Center, and Congress Plaza Hotel LLC,

*Plaintiff-Appellant,*

*v.*

UNITE HERE LOCAL 1,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:10-cv-01422 — **John J. Tharp, Jr.**, *Judge.*

ARGUED APRIL 17, 2014 — DECIDED JULY 29, 2014

Before MANION, SYKES, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* The Congress Plaza Hotel appeals
the dismissal of its lawsuit, on summary judgment, alleging
that the Unite Here Local 1 Union has engaged in unfair la-
bor practices during its historically long-running strike

against the Hotel.[1] The strike began back in 2003, but apparently escalated in 2008, when the Union pursued a new and more aggressive strategy. It began engaging in secondary activity—i.e., targeting organizations that had made arrangements to reserve large blocks of rooms or space at the Hotel, in the hopes that they would cancel their plans and thus pressure the Hotel to end the strike. The Union would send delegations, consisting of striking Hotel workers and Union staff in groups of between two and ten people, to the stores and offices of these potential Hotel patrons. Delegates were instructed to impress upon the decision-makers of these organizations, both orally and through written materials, the Union's position in the strike and its disapproval of the target organization's plans to use the Hotel. The conduct of these delegates is the focal point of this case.

The Hotel claims that the Union delegations crossed the line into unlawful secondary labor activity, in violation of 29 U.S.C. § 187(a) and 29 U.S.C. § 158(b)(4)(ii)(B). It claims that, instead of utilizing persuasion, the Union coerced the Hotel's customers into cancelling their agreements to book rooms at the Congress. Although the strike eventually ended on May 29, 2013, the Hotel seeks damages for past activity under Section 187(b). At the close of discovery, the district court granted the Union summary judgment, on the ground

---

[1] This is the third appeal to this court that has originated from the dispute between the Congress Hotel and its striking employees. *See 520 S. Mich. Ave. Assocs., Ltd. v. Shannon*, 549 F.3d 1119 (7th Cir. 2008); *520 S. Mich. Ave. Assocs., Ltd. v. Devine*, 433 F.3d 961 (7th Cir. 2006). However, this case presents an entirely separate set of legal and factual issues.

that the Union's conduct was not coercive, and that barring it as a matter of federal labor law would raise important free speech concerns. We now reverse the district court's decision in part, and remand for a trial regarding whether certain of the defendant's actions were coercive, whether any such coercive conduct damaged the Hotel, and if so, to what extent.

## I.       Background

Because this case comes to us on summary judgment, we will recite the facts the Hotel has put into the record, resolving every reasonable factual dispute between the parties in its favor. *See Griffin v. City of Milwaukee*, 74 F.3d 824, 826–27 (7th Cir. 1996). We do not vouch for their ultimate truth or accuracy.

### A. The Alleged Secondary Activity

The Hotel has accused the Union of unfair labor practices with regards to the following potential customers. We begin with the allegations we consider most likely to be actionable:

### 1. *American Tango Institute (ATI)*

ATI contracted with the Hotel in 2010 to host its tango festival that August. According to ATI president Netza Roldan, the organization is a "very small, nonprofit organization" that uses the tango festival as its "annual fundraiser event." Union officials responded to ATI's plans by sending Roldan a letter on May 7 requesting that he cancel ATI's plans with the Hotel. It also began contacting him by fax, mail, and telephone. According to Roldan's testimony, the Union left telephone messages and sent emails every ten minutes for one hour on the morning of May 11, 2010, and also made three or four calls to his personal phone. Roldan soon learned that the Union had called and emailed ATI's

artistic director, Jorge Torres, to inform him of the Union's opposition to ATI's booking, even though Torres played no part in that decision. Roldan sent contemporaneous emails to the Hotel complaining about the Union's repeated contacts.

Although Roldan initially called Union officials and told them he did not want to communicate with them any further, the delegations persisted in setting up a meeting at ATI's headquarters in Chicago. The delegation, consisting of between seven and nine people, had notified Roldan in advance that it was coming. Roldan testified that at this meeting Union delegates threatened to visit ATI affiliates "and go to their houses or companies" in order to add pressure. They also allegedly threatened to picket the tango festival itself. Roldan earlier noted that Union boycott coordinator Jessica Lawlor had registered to attend the festival on the ATI web site, and he had no reason to think she intended to be a good-faith participant. Roldan further testified that this first meeting was sufficiently heated that he told his assistant to be prepared to call the police. The Union members then left and the police were not called.[2]

After this first meeting, Union delegates entered ATI's office, which was located on the third floor of an office building that was secured by electronic lock, and left literature behind on two occasions. On a third occasion they left literature in the lobby of the building. Roldan testified that no Un-

---

[2] A few weeks after the first meeting with the Union delegation, ATI's web site was hacked and infected with a virus of unknown origin. However, Roldan did not assert that he suspected the Union of a cyber attack.

ion representative was given permission to enter the building to drop literature. Union members also apparently posted a letter on Roldan's office door demanding that ATI cancel its reservations with the Hotel.

About two weeks after the first meeting, Roldan arranged a second face-to-face discussion with a Union delegation, but he remained firm that he did not want to change ATI's room reservations. He testified that the delegation threatened to "have people in [the festival] and talking to our guests" about the strike. Even after this second meeting, the Union continued to contact ATI. Roldan testified that he felt "harassed" and "pressed" to cancel the arrangements with the Hotel, and that he was concerned that the Union would picket the festival and harass its participants, along with ATI's members, clients, sponsors and employees, such as Jorge Torres.

Roldan and ATI's board thereafter decided to cancel the contract with the Hotel, even though the organization did not have an alternate site ready. ATI eventually moved the festival to a smaller venue in a different part of the city on short notice. Roldan testified that ATI "had to change the whole concept of the event" due to the change. The new venue was not a hotel, which meant that participants had to lodge away from the festival. This inconvenience allegedly harmed the event's attendance. As a result, ATI lost approximately $20,000 and had to revise its marketing materials to reflect the change in hotels. Roldan estimated that ATI also lost about $40,000 in expected revenue due to a decrease in participation. The organization also reportedly suffered a 60% drop in membership following the incident.

2.  *International Housewares Association (IHA)*

IHA contracted with the Hotel for four years' worth of room blocks, from 2008 to 2011, for its annual trade show. In early 2009, Union representative Jessica Lawlor phoned IHA vice president Mia Rampersad to tell her that the IHA should not book rooms at the Hotel. Rampersad testified that Union delegations entered IHA's offices in Illinois and threatened to picket the IHA trade show, although the word "picket" may not have been used. Union phone bankers also began calling affiliated retailers and prospective attendees of the trade show, asking them to put pressure on IHA to cancel its plans with the Hotel.

Lawlor testified that, during one visit to IHA offices, one Union delegate walked past IHA security to tell IHA president Phil Brandl "shame on you" while he was in a meeting. IHA officials advised its security not to let in the Union delegations. Rampersad and IHA vice president of finance Dean Kurtis both testified that they were concerned that the Union might attempt to picket the trade show or even board IHA busses used to take attendees to the event. However, they could not recall any Union member making a specific threat to target the busses or the trade show.

In February of 2009, a Union delegation, numbering three or four members, went to IHA's offices without an appointment. The delegates were asked to leave when they reached the reception area, but refused to do so. Kurtis then called the police. Although the delegation eventually left, a smaller delegation of "one or two" Union representatives returned

later that day. IHA's president, Phil Brandl, decided to meet them in the basement cafeteria of the building.

IHA soon became aware of reports that the Union was contacting and visiting IHA's board members, retailers, and exhibitors' offices in Chicago; exhibitors complained that they were being harassed. Rampersad testified that she likewise felt harassed into cancelling IHA's plans with the Hotel, rather than persuaded to adopt the Union's position. On February 10 she sent an email to other decision-makers at IHA stating that the Union's conduct was "bordering on harassment." According to Rampersad, the Union soon opened up two additional fronts in its battle to have IHA cancel its patronage of the Hotel.

### a) Rick Bayless, Celebrity Chef

As part of its efforts, the Union contacted Rick Bayless, a famous chef and owner of two Chicago restaurants, the Frontera Grill and Topolobampo. Bayless was scheduled to conduct a cooking demonstration at the IHA trade show. Rampersad was informed that the Union was leafleting in front of one of Bayless's restaurants. The manager of the Frontera Grill, Jennifer Fite, testified that she saw two people handing out fliers inside the restaurant. Lawlor testified that the Union delegated at the restaurants three times, attempting to meet with Bayless directly, before sending a fourth delegation to distribute the fliers.

The fliers contained four bullet points of information quoting apparent citations from government health inspections of the two restaurants. The quotes were accurate and were found in publicly available reports, but the fliers did not note that the restaurants passed the inspections despite

the quoted observations. The fliers also did not reference the labor dispute, except by including the address of a Union-sponsored web site, www.PresidentPicketsCongress.org.

b)  IHA Affiliates and RSNA

The Union also allegedly visited several IHA affiliates, including Walgreens, Macy's, and Ace Hardware stores, all located in Chicago. IHA also learned that the Union visited the headquarters of the Radiological Society of North America (RSNA), an unrelated group that was also a prospective customer of the Hotel. One Union delegate, Jennifer Blatz, testified that a delegation boarded RSNA busses to distribute leaflets about the strike. She also testified that a delegation entered a Macy's store attempting to see the General Manager; she conceded that management "may" have threatened to have the delegation arrested for trespassing. Rampersad was informed by an RSNA official that six Union officials entered its offices and walked into department meetings shouting an RSNA's official's name. Rampersad testified that she was aware of the Union's activities at an Ace Hardware and RSNA by the time IHA decided to switch hotels, but she and Kurtis conceded that they were not aware of activities at Macy's, Walgreens, or other affiliates at that time.

By February 18, IHA decided to cancel its pending block reservations with the Hotel. That still left 100 rooms already reserved by individuals in advance of the 2009 trade show. Jessica Lawlor advised Rampersad by phone that the Union's activities "would not stop" until IHA completely disassociated itself from the Hotel.

3. *Reed Exhibitions*/*Chicago Comic and Entertainment Expo*

Reed Exhibitions reserved a block of rooms with the Hotel for the April 2010 Chicago Comic and Entertainment Expo. Ron Zobel and Lance Fensterman were responsible for obtaining lodging for the event. Fensterman testified that the Hotel's low rate was a central motivating factor in the decision to book there, because many of the Expo's attendees would be paying out of pocket, rather than having their expenses covered by an employer. Two months after making the reservation, the Expo's organizers were told that affiliated retailers were being picketed at their places of business— i.e., comic book stores.

In late 2009, the Union sent delegations to nine comic book stores, according to the testimony of Union organizer Jessica Lawlor. The Union apparently was following Fensterman's own visits to the stores and confronting him at each stop. Fensterman testified that he specifically remembered the Union's activities at two comic book stores: Challengers Comics and Graham Crackers Comics, both in Chicago. At one store Fensterman noticed as many as ten Union members, four or five of whom were carrying two-foot by one-foot signs. Fensterman testified that the Union members were polite and non-disruptive, and the comic book stores were open to the public. But he also characterized their visits as "incredibly uncomfortable," and sent an email to Zobel in December of 2009, stating, "I want to drop this contract [with the Hotel]. I had strikers at all of my retail visits in Chicago this week." The delegations made clear that they would continue following Fensterman until he canceled the Hotel reservation. Fensterman testified that the delegations

to the comic book stores "sen[d] a message that doing business with [Reed Exhibitions] can be damaging to your business."

Zobel wrote to the Hotel management in February of 2010 to explain the decision to cancel the block reservation, noting that the Expo's attendees and exhibitors were subject to "physical[] target[ing] and picket[ing]." The letter cited the strike as one of two reasons that Reed Exhibitions terminated the contract (the other being a lack of expected guest room usage).

4.  *NeoCon/Merchandise Mart Properties (MMP)*

MMP reserved room blocks with the Hotel for its 2009 and 2010 NeoCon trade show. Chris Kennedy is the president of MMP and was allegedly considering a run for the United States Senate at the time. Union delegations visited NeoCon exhibitors with leaflets urging them to call Kennedy through the main number at MMP, even though, aside from being president, he had no role in contracting with the Hotel. Union delegations met once with Kari O'Shea, who was in charge of the Hotel reservation, without an appointment and visited numerous exhibitors. They may also have inadvertently visited the homes (rather than the business addresses) of certain targets. Kennedy at one point allegedly engaged in a screaming match with a Union official over the phone. Eventually MMP canceled its reservation.

5.  *America's Next Top Model (ANTM)*

Ansia Production contracted with the Hotel for meeting space to conduct a casting call in September 2008 for its reality show, America's Next Top Model. The Union soon sent out emails to sympathetic recipients asking them to call and

email one of the show's corporate sponsors. At one point a Union organizer sent an email to supporters observing that one of their targets had a full voicemail, but he nevertheless urged that the email's recipients continue to call the number. According to Lawlor's testimony, the Union's policy was for members to call a target only once. Two days before the scheduled casting call, ANTM canceled its arrangement with the Hotel.

6. *WordCamp Chicago*

In February of 2010, WordCamp Chicago, a non-profit, scheduled its bloggers conference at the Hotel for that June. Within a week the room block reservation was canceled, allegedly because its lead organizer, Lisa Sabin-Wilson, was "email-bombed" by Union activists. However, during her testimony Ms. Sabin-Wilson was able to discuss only one or two emails from the Union, along with numerous Twitter messages and social media postings. She also alleged that the Union had obtained WordCamp's registrant and sponsor lists and had begun emailing individuals and threatening protests and bad publicity if the event were held as scheduled. Ms. Sabin-Wilson stated in her cancellation email to the Hotel that the conference location would have to change so that "our attendees and sponsors stop being harassed." She complained that her organization was "not comfortable with the union pressure" and that such pressure "persisted all week long" prior to her decision to move the conference.

7. *Midwest Clinic*

The Midwest Clinic is a nonprofit organization that had contracted with the Hotel from 1995 to 2008 to provide overflow housing and meeting space for its annual conference of

school band and orchestra directors. Kelly Jocius became the Clinic's executive director in 1997. In 2003, at the beginning of the strike, Jocius met with a Union representative at his office. The meeting was "confrontational," but Jocius remained committed to staying with the Hotel.

Sometime between 2004 and 2006, Jocius met Teran Loeppke, a boycott coordinator for the Union, in a social capacity. Jocius testified that, once Loeppke learned that he was associated with the Clinic, the two "spoke on the phone and after that he came to the office maybe three times. I don't know." He testified that he and Loeppke "rais[ed] our voices" in disagreement during one such phone conversation. When Loeppke visited the Clinic's office, Jocius informed him that he was not welcome there: "[a]t that point I refused to meet with him and my coworkers would stop him at the door." It is not clear from the record how Loeppke responded to Jocius's refusal to meet with him. Jocius added that Loeppke's visits were "unannounced" and that this "offended" him because they occurred during the Clinic's "busiest time of the year."

In 2008, the Union began contacting the Clinic's board members, clinicians, directors, trustees, and staffers, including some at their home phones. Jocius testified that these contacts came "in waves." But he went on to explain, "I don't think any board member heard from [the Union] more than twice, maybe three times at the most." Jocius testified that he was not surprised by the calls because the board members "are public figures." He further stated that board members "didn't complain [about the Union contacts]. They just called to let me know" they were occurring. Jocius also

received three separate letters from the Union, each requesting that the Clinic cease doing business with the Hotel.

The Clinic cancelled its arrangement with the Hotel in 2009. Jocius could not positively identify why the change was made, but observed that the Union's activities "might have been a concern." He also stated that decision-makers at the Clinic wondered whether "we want[ed] to continue using a hotel that has a strike taking place."

8. *Chicago Film Festival*

On June 6, 2005, at least a few years before the Union began delegating at neutral businesses, the Hotel offered Cinema/Chicago approximately 100 room nights (eight rooms a night for approximately two weeks) free of charge, in exchange for advertising during the organization's main event, the 41st Chicago International Film Festival. Shortly thereafter "The Alliance for Justice at the Congress Hotel," an umbrella group of organizations that included the Union, sent a letter to the management of the film festival stating that "[i]t is not unlikely that strikers and supporters might be present outside the Chicago Theater on Oct. 6 during the opening gala in order to publicize this injustice with leaflets and bullhorns." Similar letters were sent to actress Susan Sarandon and the late film critic Roger Ebert, who were expected to attend the event. The festival canceled its reservations. It informed the Alliance in a September 29, 2005, letter that "[b]ased on your letter and our concern for the Festival, we are canceling our reservations at the Congress Plaza Hotel." The letter noted the "great expens[e]" the festival endured in declining to take advantage of rooms it did not have to pay for.

The Managing Director of Cinema/Chicago, Sophia Wang Boccio, testified that the decision to reject the 100 room nights was "totally a reaction to something that might be bad happening to the opening night." She also offered that the Union's actions could bring "embarrassment to the Film Festival" during its opening gala. But Boccio later speculated that any protest would be "more embarrassing to the star[s]" appearing at the gala than for regular attendees, who would spend most of their time in the theater.

9. *The National Center for Agricultural Utilization Research (AgLab)*

The National Center for Agricultural Utilization Research (AgLab) contracted to hold a conference at the Hotel in April 2005. The subject of the conference was animal gastrointestinal function, and the relevance of that detail will, unfortunately, soon become apparent. The Union responded in February by sending AgLab a "cow pie valentine"—a heart-shaped candy box containing cow manure. The poor receptionist at AgLab's office in Peoria, Illinois, was handed the box. AgLab employees attempted to return the "valentine," but the Union declined to accept it. Although AgLab did not cancel its block reservation, the Hotel alleges that conference attendees rented less than approximately 75% of its reserved rooms for the conference, which represents, again allegedly, a below-average yield. The Hotel attributes that low rate to the manure incident. The actual delivery of the box in February of 2005 occurred more than five years before the Hotel brought suit in March of 2010, although AgLab's April 2005 conference at the Hotel occurred less than five years before the case was brought.

### B. District Court Proceedings

The district court granted summary judgment to the Union on all issues. *520 S. Mich. Ave. Assocs. Ltd. v. Unite Here Local 1*, 939 F. Supp. 2d 863, 865 (N.D. Ill. 2013). In general, it held that the Hotel could not show that the Union engaged in any conduct more coercive than peaceful handbilling and persuading managers of secondary businesses not to contract with the Hotel. *Id.* at 875. The Supreme Court has held that such conduct is not an unfair labor practice and is squarely protected under the First Amendment. *See DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568 (1988).

As to America's Next Top Model, the NeoCon Convention, WordCamp Chicago, and the Midwest Clinic, the district court held that the Union had simply engaged in protected speech, attempting to persuade the decision-makers of these groups not to contract with the Hotel. The delegations may have been brusque, or the conversations heated, the district court reasoned, but all of the conduct alleged against the Union as to those four entities fell well within the protections of the First Amendment and federal labor law. Even taking every fact alleged by the Hotel as true, the Union's conduct was not threatening or coercive. 939 F. Supp. 2d at 877–78; 881–83.

The Hotel's accusations regarding the AgLab "cow pie valentine" incident had already been dismissed by an earlier district court ruling that held the conduct underlying the claim was time-barred. The Union sent the foul package in February of 2005, which meant that the five-year statute of limitations had already run by the time the Hotel sued in March of 2010. The Hotel then amended its complaint to re-

plead the AgLab allegations, and the district court did not rule on that issue again until the Union moved for summary judgment on all counts. The district court then held, for the second time, that the claim was untimely, for the reasons stated in the original order to dismiss. *Id.* at 876.

As to the American Tango Institute, the court discounted the Hotel's evidence of the Union's entrance onto ATI's premises, and other allegedly aggressive behavior, because ATI officials "scheduled a second meeting after [the allegedly hostile behavior], which undermines claims that [ATI] was coerced or threatened." *Id.* at 883. The court went on to hold that "[t]he Union activity at issue here—its letters, emails, phone calls, and meetings—themselves had no coercive effect on ATI as far as the evidence shows." *Id.* It also reasoned that ATI's financial and membership losses allegedly caused by changing its accommodations did not provide evidence of coercion. "At most," the district court concluded, "it can be inferred that the Union persuaded ATI to make the change that led to its financial loss—and thus ATI lost money not for defying the Union ('coercion') but for cooperating with it." *Id.*

With regard to IHA, the district court conceded that the physical entrance of Union delegates into its office space without consent rendered the legality of the Union's conduct a "closer question." *Id.* at 878. But it noted that "the IHA president subsequently met with the Union delegates voluntarily, on IHA property" before cancelling the arrangement with the Hotel. *Id.* at 879. The court therefore held that the Hotel "would be unable to prove … that the potentially threatening or coercive activity, rather than simply persuasion, directed at the IHA caused" it to cancel the booking. *Id.*

The court also ruled that, even though the fliers directed at celebrity chef Rick Bayless did not reference the Union's labor dispute with the Hotel, they were nevertheless protected by the First Amendment as true and accurate information about his restaurants. The court observed that handing out the leaflets outside of Bayless's restaurants was core First Amendment activity. *Id.* at 879–80.

As for the Union delegations to IHA's exhibitors and affiliates, the court found that the Hotel's case suffered from "a similar lack of evidence of threats or coercion as to most of the delegations who visited IHA exhibitors or other affiliates, to the extent that the IHA decision-makers knew about these contacts before deciding to cancel the Hotel contract." *Id.* at 879. In other words, because IHA decision-makers at the time were unaware of the Union's visits to most of its affiliates, those activities could not have coerced the IHA's decision not to book rooms at the Hotel.

Finally, regarding the Chicago Film Festival, the court held that the threat to use a bullhorn at the protests was protected by the First Amendment because any excessive noise would be subject to the city's time, place, and manner restrictions. The court concluded that "[t]here is no evidence in the record here as to whether the (hypothetical) bullhorn would have exceeded permissible levels" of noise. *Id.* at 877.

## II.    Discussion

The standard of review plays a particularly crucial role in this case. "We review the grant of summary judgment de novo, applying the same standards as the district court and viewing the record and all reasonable inferences to be drawn from it in the light most favorable to the non-moving party."

*Griffin*, 74 F.3d at 826–27. "Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id.* at 827; *see* Fed. R. Civ. P. 56.

To defeat summary judgment, "[t]he nonmovant must articulate specific facts demonstrating that a genuine issue exists for trial." *Griffin*, 74 F.3d at 826–27. A disputed issue is "genuine" where a reasonable jury could render a verdict for the non-moving party "'if the record at trial were identical to the record compiled in the summary judgment proceeding.'" *CSX Transp., Inc. v. Chi. and Nw. Transp. Co., Inc.*, 62 F.3d 185, 188 (7th Cir. 1995) (quoting *Russell v. Acme-Evans Co.*, 51 F.3d 64, 70 (7th Cir. 1995)).

### A. The Law of Secondary Labor Activity

The Hotel alleges that the Union engaged in unfair labor practices prohibited under federal law. *See* 29 U.S.C. § 187. Specifically, the Union allegedly violated 29 U.S.C. §158(b)(4)(ii)(B), which bars certain labor activity against a secondary target. That provision is part of "Congress' striking of the delicate balance between union freedom of expression and the ability of neutral employers, employees, and consumers to remain free from coerced participation in industrial strife." *NLRB v. Retail Store Emp. Union, Local 1001*, 447 U.S. 607, 617–18 (1980) (*Safeco*) (Blackmun, J., concurring in part). The statute makes it unlawful for a union "to threaten, coerce, or restrain any person engaged in commerce" where "an object thereof is … forcing or requiring any person to cease … doing business with another person." 29 U.S.C. §158(b)(4)(ii)(B). The statute explicitly states that this prohibition does not apply to "any primary strike or primary picketing." *Id.* Section 158(b)(4) contains a proviso

noting that the above section does not "prohibit publicity, other than picketing, for the purpose of truthfully advising the public … that a product or products are produced by an employer with whom the labor organization has a primary dispute." In other words, striking against an employer engaged in a labor dispute with a union is acceptable, as is publicizing such a strike. But coercion against neutral parties is forbidden.

The Supreme Court has held that courts should exercise "caution" in interpreting the phrase "to threaten, coerce, or restrain," and not give the phrase a "broad sweep." *NLRB v. Drivers, Chauffeurs, Helpers, Local Union No. 639*, 362 U.S. 274, 290 (1960). In narrowing the text of the statute, the Supreme Court has held that the primary evils it was meant to target are secondary boycotts and some forms of picketing. Picketing "that reasonably can be expected to threaten neutral parties with ruin or substantial loss" can constitute an unfair labor practice because it is coercive. *Safeco*, 447 U.S. at 614 (1980). However, the Court has also held that "picketing [that] is employed only to persuade customers not to buy [a] struck product" is permitted. *NLRB v. Fruit & Vegetable Packers & Warehousemen, Local 760*, 377 U.S. 58, 72 (1964) (*Tree Fruits*). Therefore, to be unlawful, picketing must threaten neutral parties with substantial loss or ruin, beyond the costs from customers who are persuaded to side with the union and avoid a particular product of an employer involved in the strike.

The Court has contrasted unlawful secondary picketing with peaceful handbilling at the entrance of a secondary business, which is lawful. *See DeBartolo Corp.*, 485 U.S. at 583–84 (The statute does not "proscribe peaceful handbilling,

unaccompanied by picketing, urging a consumer boycott of a neutral employer."). In so ruling, the Court relied heavily on the constitutional avoidance canon, holding that the statute should not be interpreted as to restrict First Amendment liberties. *Id.* at 575–88 (interpreting the statute so as to "not interfere with the constitutional right of free speech"). This interpretation is particularly important because a strike is typically a matter of public concern and therefore subject to a high degree of First Amendment protection.

The *DeBartolo* Court carefully distinguished between handbilling and picketing. "The loss of customers because they read a handbill urging them not to patronize a business, and not because they are intimidated by a line of picketers, is the result of mere persuasion." *Id.* at 580. The Court noted that handbilling involves "no violence, picketing, or patrolling and only an attempt to persuade customers not to shop." *Id.* at 578. Such violence, picketing, or patrolling against neutral actors in a labor dispute is not protected under federal law or the First Amendment.

The Supreme Court has also declined to find an unfair labor practice in a case in which the National Labor Relations Board had found that up to five union members visited managers of various stores in person and informed them of the union's plans to handbill outside stores that carried certain products from an employer subjected to a strike. *NLRB v. Servette, Inc.*, 377 U.S. 46, 51 (1964); *see Teamsters Local 848*, 133 NLRB 1501, 1504 (1961), *pet. for rev. granted sub nom. Servette, Inc. v. NLRB*, 310 F.2d 659 (9th Cir. 1962), *rev'd*, 377 U.S. 46. The Supreme Court did not discuss the in-person nature of the visits in its opinion; but, in any event, we find the proposition the Union derives from this case to be uncontro-

versial: that a union delegation generally may enter upon private property, even without prior permission, at least once for the purpose of informing and persuading a decision-maker of a neutral entity not to do business with a struck employer.

Although broad picketing or boycotting of a neutral entity is the paradigmatic case of coercive secondary activity, it is not the only behavior prohibited under the statute. As the district court in this case observed, "other secondary conduct can violate the law. The restriction on secondary activity is 'keyed to the coercive nature of the conduct, whether it be picketing or otherwise.'" *520 S. Mich. Ave. Assocs.*, 939 F. Supp. 2d at 874 (quoting *Tree Fruits*, 377 U.S. at 68). In a sense, then, secondary picketing is one end of a spectrum—the prohibited end—with handbilling on the other, permissible end.

To put the matter simply, and perhaps too simply, the central question in this case is therefore whether the Union's conduct in this case is coercive, as in the sense of a boycott or picket, or persuasive, as in the case of handbilling outside an establishment. Of course, reality is not so easily divided into two neat categories, and we may find that certain aspects of the Union's conduct could be persuasive or coercive in ways that distinguish it from both handbilling and picketing.

Other courts have noted that a defining characteristic of picketing is that it creates a physical barrier between a business and potential customers, thereby "keeping employees away from work or keeping customers away from the employer's business." *Kentov v. Sheet Metal Workers' Intern. Ass'n Local 15*, 418 F.3d 1259, 1265 (11th Cir. 2005) (quotation and citation omitted). By contrast, peaceable activity that

does not create a barrier between customers and the business is typically permitted. *Sheet Metal Workers' Intern. Ass'n, Local 15 v. NLRB*, 491 F.3d 429, 438 (D.C. Cir. 2007) (finding a mock funeral at a hospital was not coercive because the Union "did not physically or verbally interfere with or confront Hospital patrons coming and going; nor … did the mock funeral participants 'patrol' the area in the sense of creating a symbolic barrier to those who would enter the Hospital.").

The conduct alleged in this case is not satisfactorily described as either picketing or handbilling. On the one hand, the delegates often took written materials with them, including handbills and leaflets. Then again, some of the conduct the Hotel describes—drawing every reasonable inference in its favor—is similar to picketing. For example, the Union followed one target, Mr. Fensterman, from one comic book store to the next, with some of the delegates holding signs as they stood inside.

Many of the Union's other activities are disturbingly similar to trespass and harassment. According to the Hotel and deposition testimony, the Union delegates entered business offices through locked doors, and repeatedly entered office or store space without permission, in one case even after police were called. In the case of the IHA, they further threatened that they would trespass onto busses or the trade show. Jessica Lawlor went so far as to register for ATI's tango festival, thus corroborating Roldan's testimony that the Union threatened to ruin that event. Union representatives called targets at home, and repeatedly visited affiliates of targeted neutrals at their places of businesses even after they were clearly informed that their targets were unpersuaded.

We will discuss each particular allegation of coercion in further detail, but this discussion suffices to explain why we choose to see the Union's actions primarily through the lens of picketing, trespass, and harassment. To be clear, we are not suggesting that the Union committed trespass, harassment, or any other crime or tort; rather, we are using those categories as descriptive devices to gauge the level of coercion the Union may have placed upon neutral organizations.

The question then becomes whether trespassing and harassment could count as coercive behavior under federal labor law. We concede that the Union is permitted some initial entry onto private property so it may convey its views to the decision-makers of a secondary organization. *See Servette*, 377 U.S. at 51. But, even in the context of primary picketing, at some point the trespass becomes unprotected. *See Sears, Roebuck & Co. v. San Diego Cnty. Dist. Council of Carpenters*, 436 U.S. 180, 205 (1978) ("[T]here are unquestionably examples of trespassory union activity in which the question whether it is protected is fairly debatable."); *Lechmere, Inc. v. NLRB*, 502 U.S. 527, 535 (1992) ("[T]respasses of nonemployee union organizers are 'far more likely to be unprotected than protected.'") (quoting *Sears*, 436 U.S. at 205); Cynthia L. Estlund, *The Ossification of American Labor Law*, 102 Colum. L. Rev. 1527, 1573–74 (2002) ("[S]tates are largely free to enforce general laws against violence, intimidation, and trespass in the context of labor disputes."). And the Supreme Court has made clear that federal labor law "does not require that [an] employer permit the use of its facilities for organization when other means are readily available." *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 114 (1956).

The same is true of harassment, which relies on the inter-
fering manner of communication, not its content, to accom-
plish its aims. The Union is alleged to have continued con-
tacting targets even after they had made clear that they were
not willing to receive delegations. Some of these contacts
were physical invasions of private property, as discussed
above. But the allegedly frequent and repetitive phone calls
(including some to people's homes) and the threats to dis-
rupt events, such as the IHA trade show, the ATI tango fes-
tival, or Rick Bayless's restaurants, also support an inference
that the Union did not intend to persuade but to force neu-
trals to take sides in its dispute with the Hotel. In another
labor context, this court has held that unions are not permit-
ted to employ harassment to achieve their ends. *See NLRB v.
Burkart Foam, Inc.*, 848 F.2d 825, 833 (7th Cir. 1988) ("Unions
may not seek information [from an employer] merely for the
purpose of harassing employees."). Although it would typi-
cally require significant harassment to coerce an organiza-
tion to make a decision against its better judgment, several
of the Union's targets, such as ATI, are small, non-profit or-
ganizations that rely heavily on volunteers or donations.
Harassment, if severe enough, could rise to the level of coer-
cive behavior under Section 158(b).

Putting the matter succinctly, we hold that a union may
be liable under § 158(b)(4)(ii)(B) for unlawfully coercing a
secondary to cease doing business with the struck employer
if the union's conduct amounts to harassment or involves
repeated trespass or both. Granted, trespass and harassment
of a secondary organization's members differ from picketing
in one central way that supports the Union's position. They
do not create a symbolic barrier between a business and its
customers in the way a picket line does. But such conduct

may nevertheless significantly disrupt a business and pose a substantial threat to an organization's finances. Indeed, trespass and harassment may be more coercive than picketing in one important sense. Picketing generally occurs outside a place of business—perhaps on a sidewalk, or on the periphery of the neutral's establishment. The Union here is accused in several instances of barging into offices, bypassing security, following certain targets around stores, and shouting at employees. This is the sort of conduct that can—and did— get the police called in to intervene. The Union's alleged conduct easily could have been as disruptive of a neutral organization's property, privacy, and business operations as any picket line. Instead of creating a barrier between customers and the business, the Union infiltrated their neutral targets and disturbed them from the inside. That behavior, if proven, can be deemed coercive. It is also important to point out that Section 158(b) does not merely bar coercion that is actually exerted; it also does not permit the Union "to threaten" a neutral with unlawful secondary activity.

Another important point is that the conduct alleged by the Hotel was generally targeted at employees, not customers passing by, as in handbilling. A fellow appeals court approved of a "mock funeral" a union held outside its employer hospital in part because the presentation was "addressed solely to customers," not employees of the neutral entity. *Sheet Metal Workers*, 491 F.3d at 438. To be clear, the Union's actions do not implicate Section 158(b)(4)(i)(B)'s ban on inducing secondary employees to strike. But its alleged decision to repeatedly target secondary employees indicates an intent not to persuade, but simply to interfere.

Certainly, a single trespass or isolated instance of harassment likely would not threaten "ruin or substantial loss," in much the same way that a picket against one struck good would likely not coerce a store owner. But repeated, sustained trespass or harassment, when used as a labor tactic, seeks to compel a certain result instead of fostering persuasion or communication. The Supreme Court has clearly indicated that coercive, as opposed to persuasive, conduct is the hallmark of unlawful labor activity.

Again, we must make clear that the Hotel need not show that the Union is criminally or civilly liable for trespass or harassment in order to prevail. The Union's conduct need not be illegal outside the secondary boycott context. After all, primary picketing—against the employer whose employees are striking—is permitted under federal labor law. What 29 U.S.C. § 158 makes unlawful is secondary picketing—that is, picketing against neutral organizations. Such conduct impermissibly widens a labor dispute to the detriment of the entire economy, and coerces uninvolved entities to take sides. Because the conduct here is concededly directed at secondary actors, it may potentially fall under the ambit of Section 158(b) if it is substantially similar to picketing and sufficiently coercive. We will later discuss in detail why at least some of the Union's conduct meets that test.

### B.  Free Speech Concerns

Although some of the Union's conduct may qualify as secondary picketing, the Supreme Court has cautioned us to be especially careful not to label expressive union conduct as coercive if such an interpretation could interfere or limit free speech. It is undisputed that the Union delegations all attempted to communicate a message on a topic of public con-

cern. According to the Hotel, however, they went further, and engaged in conduct that rendered their activities unprotected and illegal. We conclude that prohibiting some of the Union's conduct under the federal labor laws would pose no greater obstacle to free speech than that posed by ordinary trespass and harassment laws. Our decision breaks no new ground in First Amendment law, and does not require invocation of the constitutional avoidance canon.

It is important to note that the Supreme Court has already held that "[s]econdary boycotts and picketing by labor unions may be prohibited," because of "the strong governmental interest in certain forms of economic regulation, even though such regulation may have an incidental effect on rights of speech and association." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 912 (1982). This is true even though the Court has observed that "picketing is a mixture of conduct and communication" that contains expressive elements. *DeBartolo Corp.*, 485 U.S. at 580 (citation and quotation marks omitted). And, as we have seen, Congress has long prohibited secondary boycotts and picketing. To the extent that the Union's conduct in this case is equivalent to secondary picketing, and inflicts the same type of economic harm, it too may be prohibited without doing any harm to First Amendment liberties.

But even aside from the ban on secondary picketing, we find that some of the Union's alleged conduct is not protected speech. The leading case on the clash between the First Amendment and the property right to exclude trespassers is *Lloyd Corp. v. Tanner*, 407 U.S. 551 (1972). In *Lloyd Corp.* the Supreme Court held that, under the federal constitution, a private owner of a shopping center could enforce a policy

against handbilling inside the center even though it was largely open to public shoppers. The Court has applied that principle to the labor context, holding that union picketers "did not have a First Amendment right to enter [a] shopping center for the purpose of advertising their strike against" one of the stores contained within it. *Hudgens v. NLRB*, 424 U.S. 507, 520–21 (1976). In *Hudgens* the Court emphasized that "the constitutional guarantee of free expression has no part to play in a case such as this." *Id.* at 521.

The next question is whether the Union's allegedly harassing conduct may reasonably be deemed protected under the First Amendment. We hold that it is not. Various forms of harassment are banned under state and federal law. *See Gresham v. Peterson*, 225 F.3d 899, 908–09 (7th Cir. 2000) (upholding statute banning aggressive panhandling because it "would prohibit the type of harassing behavior that governments routinely outlaw[,]" such as "'repeated or continuing harassment of another person that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened'") (quoting Ind. Code § 35-45-10-1). Such laws unquestionably serve important state and public interests.

Important First Amendment interests are not threatened in this case because the Hotel's complaint is narrowly tailored to address the Union's conduct—visiting offices, making phone calls to decision-makers (sometimes at home), carrying signs—without reference to the content of its message. The Second Circuit upheld a state telephone harassment statute on the grounds that it "regulates conduct, not mere speech. What is proscribed is the making of a telephone call, with the requisite intent and in the specified manner." *Gormley v. Dir., Conn. State Dep't of Prob.*, 632 F.2d 938, 941–42 (2d

Cir. 1980). The Ninth Circuit just recently used that same ra-
tionale to uphold the federal anti-stalking statute, 18 U.S.C. §
2261A, against constitutional challenge. The court held that
the statute targeted speech only incidentally, and principally
"proscribes harassing and intimidating conduct." *United
States v. Osinger*, 753 F.3d 939, 944 (9th Cir. 2014). The Eighth
Circuit has reached the same conclusion. *United States v. Pe-
trovic*, 701 F.3d 849, 856 (8th Cir. 2012). Prohibiting the Un-
ion's conduct here likewise will limit speech only in the most
incidental way, while serving a significant governmental in-
terest in preserving labor peace. *See R.A.V. v. City of St. Paul,
Minn.*, 505 U.S. 377, 390 (1992) ("Where the government does
not target conduct on the basis of its expressive content, acts
are not shielded from regulation merely because they ex-
press a[n] … idea or philosophy.").

There is another reason why some of the Union's alleged
harassment merits less First Amendment protection. The
Union is accused of transmitting its messages to an unwill-
ing, captive audience. Even with regards to handbilling, the
Supreme Court has "spoke[n] of a right to distribute litera-
ture only to one willing to receive it." *Frisby v. Schultz*, 487
U.S. 474, 485 (1988) (internal quotation marks omitted). Alt-
hough the Supreme Court has expressed greatest concern
with unwanted messages within a listener's own home, *id.* at
484 ("the home is different"), it stands to reason that First
Amendment liberties are less fundamental when the speaker
is cornering an unwilling audience in a private office space.
*See Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 781
(1994) (Stevens, J., concurring in part) (The First Amendment
does not provide "an unqualified constitutional right to fol-
low and harass an unwilling listener."). It is hard to imagine,
for example, that the publicly observable images of nudity

permitted in *Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975), would receive similar protection within a workplace setting. The freedom of an unwilling listener to avert one's eyes or ears is considerably lessened when she is required to be on the job, or to check her phone messages. First Amendment freedoms would therefore not be significantly chilled by a ruling that the Union harassed an essentially captive audience.

The precedent cited by the Union underscores this point. In *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 168 (2002), the Court invalidated an ordinance prohibiting canvassing "in and upon" private property prior to obtaining a permit, but it based that decision in part on the fact that the ordinance already provided protection to unwilling listeners by allowing them to obtain "No Solicitation" signs that canvassers would be required to respect. The same is true of *Martin v. City of Struthers, Ohio*, 319 U.S. 141, 148 (1943) (approving of a "regulation … which would make it an offense for any person to ring the bell of a householder who has appropriately indicated that he is unwilling to be disturbed."). Indeed, the *Martin* Court recognized that "[t]raditionally the American law punishes persons who enter onto the property of another after having been warned by the owner to keep off." *Id.* at 147. The Union also cites *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2670 (2011), but that decision again reaffirms the principle invoked by the Hotel. *See id.* (striking down ban on pharmaceutical marketing in part because "[d]octors who wish to forgo detailing altogether are free to give 'No Solicitation' or 'No Detailing' instructions … at their places of work."). The Hotel is simply asking that the Union respect its customers' freedom to be left alone to conduct their business.

Finally, we think that *Servette* gives the Union ample breathing room to express its views by permitting delegates to approach and talk to decision-makers of neutral businesses, even if they are initially uninvited. But once that decision-maker says that she is not interested, and that the Union delegates are no longer welcome, the Union's free speech interests start to wane, and the property and privacy rights of the neutral target become dispositive. Certainly, when the police are called to haul the delegates away, it should be clear that the Union's attempts to persuade have been rebuffed. And sneaking past a locked office door without permission is a sure sign that one is doing more than simply exercising his First Amendment rights. The constitutional avoidance canon cannot save the Union here.

In sum, we conclude that, if the Hotel can provide evidence permitting a reasonable inference that the Union essentially committed trespass or harassed secondary organizations, or threatened to do the same, and thereby coerced them to cease their business with the Hotel, summary judgment would be inappropriate in this case. We now must turn to whether the Hotel has met that burden.

### C. Application to this Case

To defeat summary judgment, the Hotel must create a reasonable dispute of fact as to each element of their claim. It must provide evidence, first, that the Union coerced at least one neutral target. This means that the decision-makers of the target must have felt that their only choice was to accede to the Union's demands or else face substantial loss or ruin. *DeBartolo Corp.*, 485 U.S. at 580. But it also requires that the decision maker's belief be objectively reasonable—i.e., that an ordinary person in the decision maker's position would

have felt coerced. Second, the Hotel must show that the Union used coercion with the intent of forcing the neutral entity not to do business with the Hotel. *See Int'l Union of Operating Engineers, Local 150 v. NLRB*, 47 F.3d 218, 223 (7th Cir. 1995). Third, the Hotel must prove that the targeted neutral ceased or reduced its business with the Hotel. Fourth, that decision must have been caused by the coercive conduct. And finally, the Hotel must prove that it was damaged by the neutral's decision.

We now examine each of the nine incidents identified by the Hotel to see if a reasonable jury, drawing every inference in its favor, could find all of the above elements met.

1.   Partial summary judgment is appropriate.

The district court properly granted summary judgment on claims regarding the "cow pie valentine" allegedly sent to AgLab. Even if the claim was not untimely—and we do not decide that question—the Hotel cannot prove damages because AgLab did not cancel its room block order. It does not even attempt to establish that the under-75% yield on AgLab's room reservation was significantly below normal, or due to the Union's cow pie tactic. It points to no testimony from any person who stayed at a different hotel because of the incident. Moreover, the cow pie valentine implicates concerns regarding symbolic speech. *See Texas v. Johnson*, 491 U.S. 397, 406 (1989). The Supreme Court has already employed the constitutional avoidance canon to steer a wide berth away from any First Amendment concerns. *DeBartolo Corp.*, 485 U.S. at 575-88. We must do the same in this case.

Similarly, no reasonable jury could conclude that the Union's threat to demonstrate using "leaflets and bullhorns" at

the Chicago Film Festival was coercive. The district court correctly held that "[t]here is no evidence in the record here as to whether the (hypothetical) bullhorn would have exceeded permissible levels" of noise under state and local law. 939 F. Supp. 2d at 877. Although we must make every reasonable inference in favor of the Hotel, it has pointed to no evidence by which we may infer that the Union would have disrupted the film festival. "Speculation is insufficient to withstand summary judgment." *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1127 (7th Cir. 1996). The Alliance's letter to the film festival's organizers does not state or imply that any protestors would violate the applicable time, place, and manner restrictions. And the Hotel can point to no external evidence to support that inference. It is important to note that the incident with the film festival occurred in 2005, before the Union apparently switched its tactics and began sending delegations to neutral entities. Thus, we cannot associate the Union's threatened protest at the film festival with any of its later, more aggressive methods. The Hotel has failed to meet its burden to adduce evidence sufficient to create a question of material fact as to the potential disruption the Union might have caused.

It is true that bullhorns and other noise-making instruments can be disruptive in various contexts. If the Union had, for example, threatened to protest inside the theater during the opening gala, or if the film festival had been held outside, so that noise from bullhorns easily could have ruined the experience for moviegoers, those facts would present a different, and more compelling, case for the Hotel. This would be especially true if the Union had threatened simply to make loud noises during the festival, rather than to amplify their speech through bullhorns, or if the Hotel

had documented any past examples of the Union engaging in disruptive behavior with those devices. But the mere statement that Union members will appear outside an event with bullhorns falls short of what is required to defeat summary judgment.

The Hotel's claim regarding the film festival must fail for two additional reasons. The relevant decision-maker for the film festival, Sophia Wang Boccio, could not affirmatively state that her organization was coerced by the Union. To be sure, the decision to pass up free hotel room days (in exchange for advertising) supports an inference that the festival did so only under threat of an even greater financial loss. But Boccio indicated that the decision to abandon the Hotel was made to avoid embarrassment and bad publicity; she did not recall that the organizers were concerned about an out-of-control bullhorn ruining the opening night gala. She did testify that the change was "totally a reaction to something that might be bad happening to the opening night." But there is no indication that she believed the event would be illegally disrupted.

Moreover, as with the AgLab incident, we must be wary of infringing on the Union's First Amendment rights. Leaflets and bullhorns are classic instruments of speech. *See Stokes v. City of Madison*, 930 F.2d 1163, 1169 (7th Cir. 1991) (holding that "amplified speech is a protected form of expression"); *Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 358 (1997) ("Leafletting and commenting on matters of public concern are classic forms of speech that lie at the heart of the First Amendment."). We hesitate to restrict their use solely based on the fear that they will be misused. Barring at least some indication that the Union would exceed applica-

ble time, place, and manner restrictions, or else would project their speech from some place other than a sidewalk or other public forum, we must affirm the district court's grant of summary judgment on this point.

The district court also properly granted summary judgment on allegations regarding the Midwest Clinic, the Neo-Con Convention, WordCamp, and America's Next Top Model. The conduct the Hotel alleges in these instances cannot amount to coercive pressure on par with picketing. We can quickly dispose of the Hotel's specific allegations regarding these four targets in turn.

The Union did not trespass on the Midwest Clinic's property or picket outside it. Union delegates did visit the Clinic's office at least three times during the Clinic's busiest season, but the Hotel failed to provide any detail about how those meetings went. There is no evidence in the record to suggest that delegates remained on the premises after being asked to leave. Although repeated incursions inside an office space could be deemed coercive, the Hotel points to no facts indicating that these Union delegates ever set foot in the Clinic's office, as opposed to waiting outside and then leaving once they were denied entry. More importantly, the Clinic's executive director, Kelly Jocius, does not even allege that the Union's secondary activity influenced the Clinic's decision not to use the Hotel. He testified that its leadership was hesitant to frequent a hotel that was combatting a strike. In other words, the Clinic's decision-makers seem to have been persuaded by the Union. The Hotel's position was therefore fatally deficient both in identifying the alleged coercive behavior and in showing that the Clinic was in fact motivated by that behavior when it decided to change its

reservation. Had Jocius's testimony been clearer and more supportive of the Hotel on either or both of these points, this would be a different case.

Likewise, the Union's conduct with regards to the Neo-Con convention involved communication, as in peaceful handbilling, not physical trespass or repeated patrolling or harassment. Although some exhibitors were apparently called at their homes, the Hotel has not demonstrated persistent harassment of anyone associated with NeoCon. The delegates are not alleged to have overstayed their welcome, snuck onto private property, or prompted a call to the police. This conduct cannot reasonably be deemed coercive. Distributing fliers urging people to call MMP's president Chris Kennedy is a protected speech tactic, and is actually less drastic than the concededly protected activity of distributing handbills urging customers to boycott the NeoCon convention entirely.

As to WordCamp, the Union primarily used emails and social messaging to get its point across. This communication was much more similar to protected handbilling than picketing. The Hotel alleges WordCamp's lead organizer was "email-bombed" by Union activists, but it points primarily to Twitter messages and social media postings. These writings are pure, protected speech about a matter of public concern. They also pose very little risk of harming an unwilling or captive listener; after all, anyone can unsubscribe from Twitter. Unlike an "email bomb," which at least plausibly could be disruptive of WordCamp's activities, passive social media postings are not coercive in this context. Although the Union did allegedly contact WordCamp's registrants and sponsors, there is no evidence in the record indicating that

the Union did anything other than attempt to persuade these individuals.

Finally, the Union used only phone calls and emails to persuade a sponsor of America's Next Top Model. The fact that one target's voicemail was full does not by itself create the inference that the Union's conduct was coercive or tantamount to picketing. The Hotel does not even point to a witness statement alleging that the reason the voicemail was full is that the Union bombarded it with messages. In any event, there is no reason to think that anyone was so flummoxed by the overflowing voicemail box that the show's organizers felt coerced to cancel their contract with the Hotel.

   2.   A trial is necessary to resolve the remaining claims.

This court will reverse summary judgment, however, regarding the Union's behavior toward ATI, IHA, and the Comic Expo.

### a.   *American Tango Institute (ATI)*

Granting all reasonable inferences in favor of the Hotel, it has demonstrated that the Union coerced ATI into abandoning its business with the Hotel. There are two particularly objectionable aspects to the Union's alleged conduct. First, even after ATI president Roldan had told the Union twice, once by phone and also in a heated, in-person meeting, that he was not persuaded to aid their cause, delegates apparently snuck into ATI's offices unobserved and dropped literature in its offices on several occasions. President Netza Roldan testified that the Union was not given permission to enter the office, and would have had to circumvent an electronic lock in order to enter. The Union has not provided an innocent alternative explanation as to how its personnel en-

tered ATI's offices.[3] Instead of accepting that their attempts at persuasion had failed, at least for the time being, the Union arguably trespassed multiple times.

Second, Roldan testified that the Union threatened to attend the tango festival in order to disrupt it. This testimony is corroborated by the fact that Union organizer Jessica Lawlor registered to attend the event. Moreover, Union delegates allegedly threatened to confront ATI affiliates "and go to their houses or companies." Even if Roldan's testimony on this point turns on his credibility, such determinations are appropriate only at trial. If his testimony is true, the Union's threat could easily be deemed coercive.

Other circumstances support an inference of coercion. Union representatives allegedly called Roldan frequently; one morning he was called every ten minutes for an hour. Although phone calls are rarely coercive by themselves, their frequency could indicate to a reasonable fact-finder that the Union was interested in harassing Roldan rather than communicating with him. Finally, according to Roldan, his first meeting with a Union delegation was particularly contentious, and he considered calling the police. Nevertheless, the Union persisted in contacting Roldan and threatening further action until he relented.

---

[3] At oral argument the Union speculated that a delegate may have entered through the secured door as an authorized person was walking in or out. However, this must have occurred multiple times to account for each of the literature drops Roldan identifies. Moreover, this explanation would still not make it reasonable for a delegate to assume she had permission to enter the ATI's offices, especially after Roldan had already met with the Union and refused to change his position.

The district court failed to make all inferences in the Hotel's favor when it noted that "Roldan scheduled a second meeting" with the Union, and held that this decision "undermines claims that [ATI] was coerced or threatened." That is certainly a permissible inference to draw. But one could just as easily conclude that Roldan was intimidated into meeting the Union in order to stop the coercive behavior described above.

Also aiding the Hotel's case is evidence that ATI suffered a substantial economic blow in changing its venue. Roldan testified that ATI spent $20,000 in marketing and other expenses relating to the change of venue, and lost as much as $40,000 in revenue due to a drop in participation. He also estimated that ATI lost up to 60% of its membership following the switch. ATI was a small, non-profit organization, so it was likely poorly situated to absorb such damage to its finances and membership. One might therefore infer that ATI felt its only choice was either to accept that serious penalty or else face an even more substantial loss—or possibly ruin—at the hands of the Union.

The district court disregarded this evidence, reasoning that "[a]t most, it can be inferred that the Union persuaded ATI to make the change that led to its financial loss." 939 F. Supp. 2d at 883. But there is very little evidence in the record that ATI was persuaded to make such a costly, last-minute change in its venue because of its newfound devotion to the cause of organized labor. There is certainly not enough evidence to preclude a reasonable inference to the contrary. Roldan testified that he felt "harassed" and "pressed" to cancel ATI's arrangements with the Hotel. Those are not the words of a convert. He also recorded such impressions in

contemporaneous email exchanges with the Hotel express-
ing concern about the Union's behavior. A reasonable jury
could conclude that the substantial financial and member-
ship loss ATI suffered was a testament to the level of coer-
cion brought against it.

The Union certainly could dispute Roldan's account;
perhaps he capitulated where a reasonable person would
have continued to firmly decline the Union's messaging. But
that determination is a quintessential question of fact that
must be determined at trial. At the very least, the small size
and non-profit nature of the tango festival indicates that
Roldan's concerns could have been justified.

### b.   International Housewares Association (IHA)

Likewise, the district court erred in dismissing the claims
regarding IHA. According to the Hotel's substantiated accu-
sations, the Union made several unwanted appearances at
IHA offices, and at one point IHA called the police.[4] This fi-
nally convinced the delegation to leave, but another one
came back later the same day. Union boycott coordinator
Jessica Lawlor even testified that a delegate walked past se-
curity to shout "shame on you!" to IHA president Phil
Brandl. IHA vice presidents Rampersad and Kurtis both tes-
tified that they were concerned that the Union would picket

---

[4] The Union contends that the Hotel has described the February 2009
visit only through hearsay. But Kurtis was present at the office and ob-
served the delegation at the reception area. He also was the one who
called the police. He was competent to testify about his observations of
the delegation's conduct and whether the delegates were welcome to
stay.

the IHA's trade show and occupy busses running to it. Although they did not testify that a delegation explicitly threatened to do this, Union delegate Jennifer Blatz testified that the Union had boarded RSNA busses in order to leaflet people heading to a function.[5] These facts could persuade a reasonable fact-finder that the Union planned to do the same to IHA.

As with ATI, the district court improperly weighed competing factual inferences on this issue and chose in favor of the Union. The district court correctly identified the Hotel's case on this point to be a "closer question," but relied on the fact that Phil Brandl eventually met with the Union "voluntarily" to draw the inference that the two sides were reasoning with each other. 939 F. Supp. 2d at 878–79. Again, that is one inference that could be drawn. But these facts could also support the inference that IHA was desperate for the coercion to stop and tried to negotiate a surrender. Rampersad herself testified that she felt harassed and pressured by the Union, not persuaded. And the fact that the eventual meeting with the Union was held in the basement cafeteria, not in Phil Brandl's office, could also support the inference that IHA was eager to keep the Union at bay. The district court itself observed that "Lawlor told Rampersand [sic] that the

---

5 The Union notes that the Hotel's complaint originally included a claim seeking damages for the Union's alleged conduct toward RSNA, and that the Hotel later dropped the claim from its amended complaint. But the testimony regarding those delegations is surely probative of the Union's common plan for pressuring neutral organizations to abandon the Hotel. A fact-finder might credit Rampersad's and Kurtis's fears that the Union would board IHA busses given that a Union delegate has admitted that the Union did just that to the RSNA.

Union had gone to the offices of IHA members, retailers, a trade publication, and a restaurant, and advised her that it 'would not stop' as long as the IHA had a contract with the Hotel." *Id.* at 867.

Rampersad's testimony regarding the Union's delegations to IHA's affiliates and RSNA further supports an inference in the Hotel's favor. The Union argues that we should ignore the evidence concerning the affiliates, in part because IHA decision-makers were not aware of most of those activities at the time they decided to cancel their arrangements with the Hotel. But Rampersad testified that she was aware of two incidents—one at an Ace Hardware store and another at RSNA—at the relevant time.[6] Moreover, the remaining incidents may be admissible as evidence of the Union's common plan with regard to the neutral site visits. A rational jury could conclude that Union delegates were instructed to trespass, disrupt business, and harass decision-makers. Specifically, an RSNA official told Rampersad that six Union officials entered RSNA's offices and walked into department meetings shouting an RSNA's official's name. According to a Union delegate, a delegation sent to Macy's was threatened with arrest by the store manager. This is an important point. The Hotel's case relies heavily on testimony of its erstwhile customers; the fact that a Union delegate provided corroboration as to the Union's conduct provides significant support to the Hotel's case.

---

[6] The Hotel does not have to rely on hearsay to establish these facts. Rampersad testified that she had heard reports about some of the Union's delegations to the affiliates, and Blatz's testimony supports the inference that those reports were true.

Even more support for the Hotel comes from the Union's leafleting of Rick Bayless's restaurant. The district court is correct that the leaflets' content was literally true and protected speech. The fliers do not imply that his restaurants failed inspection, and they accurately quote from publicly available health reports. The Supreme Court has warned us to be wary of circumscribing protected speech in an effort to prevent unlawful labor activity. *See DeBartolo Corp.*, 485 U.S. at 575–88.

The Hotel responds that the handbills did not reference the dispute between the Union and the Hotel, and therefore they had minimal communicative effect. One of the basic aims of the ban on secondary boycotting is to prevent labor disputes from spilling over into unrelated disputes, such as the quality of Rick Bayless's restaurants. On balance, though, we agree with the Union that the act of passing out fliers with truthful content would not in itself constitute an unfair labor practice.

However, the district court overlooked the testimony of Jennifer Fite, the manager of the Frontera Grill, who stated that Union delegates handed out the leaflets inside the restaurant after they had made numerous failed attempts to see Bayless himself. This conduct could support an inference that the Union committed trespass and harassed him. Therefore, although the content of the fliers is likely protected, the alleged means of disseminating them was quite different from traditional handbilling, which occurs outside the premises. Handing out leaflets inside a restaurant seems much more like an attempt to interfere with patrons' enjoyment of the establishment than an effort to persuade them of a cause. When combined with the fact that the fliers contained no in-

formation regarding the strike, aside from a single web address, we conclude that the conduct alleged by the Hotel is not necessarily protected as a matter of law.[7] Even if IHA did not know that Fite had allegedly seen handbilling within the restaurant, as opposed to in front of it, the Union's alleged trespass helped it apply pressure to Bayless, and the IHA was well aware that he was being pressured. In other words, if the delegation had stayed outside the restaurant, perhaps Bayless and his management would have found it easier to ignore.

It is also important to point out that the Union's visits to IHA's exhibitors and Bayless's restaurants in a sense constitute tertiary labor activity. That is, the Union allegedly visited the affiliates and the restaurants to pressure IHA to cease doing business with the Hotel. The link between those affiliates and restaurants, on the one hand, and the actual strike against the Hotel on the other, is extremely attenuated. The Union's strategy essentially widened the labor dispute to include affiliates of customers of the Hotel. This is exactly the sort of scorched-earth strategy that Section 158(b)(4)(ii)(B)

---

[7] It is true, as the Union points out, that the Hotel did not suggest, in opposing summary judgment, that the problem with the fliers was their method of distribution. However, the Hotel did mention Fite's observation of a delegation "within" the Frontera Grill in its Rule 56.1 statement of material facts. It also mentioned in its response to summary judgment that a delegation went to one of the restaurants "at least three times" demanding to see Bayless, and were rebuffed. We therefore find that the issue of the Union's physical presence at the restaurant, despite management's stated opposition, was adequately raised before the district court, even if the Hotel omitted one important detail of its argument.

was designed to avoid. Neutrals with only the most distant connection to a struck employer must not be reduced to collateral damage in a bruising labor battle. Congress has decided that the damage to the economy caused by such a broadened conflict is unacceptable.

The Hotel has not pointed to specific financial damage IHA suffered in changing its room booking plans. Therefore, unlike the case of ATI, the Hotel may struggle to prove that the Union threatened IHA with substantial loss or ruin. But the trade show was IHA's signature event, and a reasonable fact-finder could conclude that its potential disruption, combined with harassment of IHA's affiliates and repeated incursions into its offices, might have threatened substantial loss or ruin to the organization. Such an inference may not be correct, but the Hotel should have the opportunity to prove this point at trial.

### c. *Reed Exhibitions/Chicago Comic and Entertainment Expo*

A reasonable jury could conclude that the Union harassed Lance Fensterman during nine visits to different comic book stores. He testified that the Union delegates told him they would continue to follow him from store to store until he gave in to their demands. Although Fensterman observed that the delegates were polite, and the comic book stores were open to the public, the repetitive nature of these visits could reasonably be considered a form of harassment. We agree that union delegations may approach management and decision-makers at secondary businesses, but they cannot do so nine times, after they have already made their point. Such conduct arguably crosses the line between communication intended to persuade and picketing.

Fensterman testified that as many as ten delegates entered the store at one time, and that sometimes they outnumbered the patrons. Some of them carried small signs of protest. That behavior appears awfully similar to a picket, albeit one that travelled with Fensterman and stood inside the stores.[8] It would be reasonable for a jury to conclude that the Expo's business would suffer substantial loss if many of its affiliated stores were frequented by Union delegations whenever Fensterman showed up.

It is true that apparently no store owner called the police, and Fensterman seems to have awkwardly tolerated their repeated presence, even though he felt "incredibly uncomfortable." But a coercive effect may be inferred by both his testimony and his contemporaneous email to fellow decision-maker Ron Zobel: "I want to drop this contract [with the Hotel]. I had strikers at all of my retail visits in Chicago this week." This email causally links the decision to break with the Hotel to the "strikers" at the comic book retailers. Fensterman testified that the goal of the delegates was to "sen[d] a message that doing business with [Reed Exhibitions] can be damaging to your business." The potential economic loss Reed faced is highlighted by the fact that it favored the Hotel because of its low rates, which was important to making the Expo attractive to potential customers. Again, it is plausible that the delegations' presence was just a minor annoyance, nothing more. But such theories are best pursued at trial.

---

[8] For the reasons we have explained, the fact the delegations went inside the stores distinguishes these activities from bannering, whereby the Union may set up attended banners outside certain neutral targets.

We note that, like the IHA affiliates, the comic book re-
tailers visited by the Union were neither the primary em-
ployer (the Hotel), or a secondary organization (Reed Exhibi-
tions). Rather, they were arguably tertiary businesses whose
relationship to the Hotel was extremely attenuated. The Un-
ion put pressure on them so that they would place pressure
on Reed Exhibitions, who would in turn complain to the Ho-
tel. Again, federal labor law is designed to balance the Un-
ion's legitimate right to publicize a strike with the danger of
economic harm to uninvolved neutrals. The Union's alleged
conduct threatens that balance.

### III. Conclusion

Stepping back from our extended discussion of the facts
of this case, we must note the common theme connecting the
Hotel's claims regarding ATI, IHA and Reed Exhibitions. In
none of these instances were the relevant decision-makers
persuaded to join the Union's cause. Each one testified that
he or she felt worried about what would happen to their or-
ganizations if they defied the Union. Federal labor law per-
mits unions to distribute handbills and leaflets at a second-
ary organization, even though that neutral entity may suffer
economic loss, because those efforts depend "entirely on the
persuasive force of the idea." *Safeco*, 447 U.S. at 619 (Stevens,
J., concurring); *see DeBartolo Corp.*, 485 U.S. at 580 ("The loss
of customers … is the result of mere persuasion."). A neutral
suffers only if customers are persuaded. Here, the Union is
alleged to have skipped persuasion and instead simply inter-
fered with the inner workings of three neutral entities. That
is why this case must go to trial.

Having found that at least some of the Hotel's accusa-
tions can go forward, we emphasize that the Hotel still bears

the burden of proving every element of its coercion claims. If the Hotel can prove only that the Union engaged in protected First Amendment activity—not trespass, harassment, and the like—the Union would be entitled to a judgment as a matter of law. Similarly, if the Hotel fails to show that the Union's conduct was intentionally coercive, or causally related to the Hotel's damages, it will not prevail as a matter of fact. We do not think deciding factual issues related to coercion will be difficult; trials routinely resolve questions of whether certain conduct is threatening or extortionate. If this case goes to a jury, the court may instruct based on the elements we have discussed. These and all related issues we leave for the district court to resolve in the first instance. The order granting the Union summary judgment is REVERSED, and the case is REMANDED to the district court for further proceedings consistent with this opinion.